## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Sara Z.,                                         Case No. 22-cv-226 (DSD/TNL)

          Plaintiff,

v.                                               **REPORT & RECOMMENDATION**

Kilolo Kijakazi,
Acting Commissioner of Social Security,

          Defendant.

Fay E. Fishman, Peterson & Fishman, 2915 South Wayzata Boulevard, Minneapolis, MN 55405; and Mahesha Padmanabhan Subbaraman, Subbaraman PLLC, 222 South Ninth Street, Suite 1600, Minneapolis, MN 55402 (for Plaintiff); and

Ana H. Voss, Assistant United States Attorney, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415; Chris Carillo, Special Assistant United States Attorney, Social Security Administration, 6401 Security Boulevard, Baltimore, MD 21235; and James D. Sides, Special Assistant United States Attorney, Social Security Administration, 1301 Young Street, Suite 350, Mailroom 104, Dallas, TX 75202 (for Defendant).

## I. INTRODUCTION

Plaintiff Sara Z. brings the present case, contesting Defendant Commissioner of Social Security's denial of her application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq*. This matter is before the undersigned United States Magistrate Judge on cross motions for summary judgment, Plaintiff's Motion for Summary Judgment, ECF No. 17, and the Commissioner's Motion for Summary Judgment, ECF No. 20. These motions have been referred to the undersigned for a report and recommendation to the district court, the Honorable David

1

S. Doty, District Judge for the United States District Court for the District of Minnesota, under 28 U.S.C. § 636 and D. Minn. LR 72.1.

Based upon the record, memoranda, and proceedings herein, **IT IS HEREBY RECOMMENDED** that Plaintiff's motion be **GRANTED IN PART** and **DENIED IN PART**; the Commissioner's motion be **GRANTED IN PART** and **DENIED IN PART**; the underlying agency decision be **AFFIRMED** as to steps one through four, except as to certain opinion evidence regarding Plaintiff's tearfulness, degree of absenteeism, and physical functioning, and **VACATED** as to step five; and this matter be **REMANDED** to the Social Security Administration for further proceedings as set forth below.

## II. PROCEDURAL HISTORY

Plaintiff applied for DIB in December 2019 asserting that she has been disabled since May 2019 due to posttraumatic stress disorder, depression, anxiety, fibromyalgia, peripheral neuropathy, arthritis, "right foot issues," insomnia, chronic widespread pian, extreme fatigue, and bilateral tinnitus. Tr. 13, 102-03. Plaintiff's application was denied initially and again upon reconsideration. Tr. 13, 115, 117, 119, 132.

Plaintiff appealed the reconsideration of her DIB determination by requesting a hearing before an administrative law judge ("ALJ"). Tr. 13, 148-49. The ALJ held a hearing in September 2021, and issued an unfavorable decision. Tr. 13-34, 40-80. Plaintiff subsequently requested review from the Appeals Council, which was denied. Tr. 1-8. Plaintiff then filed the instant action, challenging the ALJ's decision. Compl., ECF No. 1.

One of the issues raised by Plaintiff was whether the ALJ was properly appointed. ECF No. 1 at 4; *see generally* ECF Nos. 25, 26, 29. The Court issued a prior Report & Recommendation, concluding that the ALJ was not properly appointed and therefore lacked the authority to hear and decide Plaintiff's case for disability benefits. Report & Recomm. at 30, ECF No. 30, *report and recommendation not adopted*, Order, ECF No. 34. Based on this conclusion, the Court recommended that the ALJ's decision be vacated and this matter be remanded to the Social Security Administration for a new hearing before a properly appointed ALJ. Report & Recomm. at 30-31. The district court stayed this matter pending resolution of the appeal in *Brian T. D. v. Kijakazi*, 580 F. Supp. 3d 615 (D. Minn. 2022), *appeal filed sub nom. Dahle v. Kijakazi*, No. 22-1601 (8th Cir. Mar. 18, 2022). ECF No. 32; *see also* ECF No. 34 at 2.

The Eighth Circuit Court of Appeals subsequently issued its decision in *Dahle*, 62 F.4th 424 (8th Cir. 2023), which was "dispositive in the Commissioner's favor." ECF No. 34 at 2. As a result, the district court declined to adopt the Report & Recommendation and returned this matter to the undersigned "for a determination on the merits." ECF No. 34 at 3.

## III. MEDICAL RECORDS

### A. Nature of DIB

In order to be entitled to DIB, Plaintiff must establish that she was disabled before her insurance expired. *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009) (citing *Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006)). "[T]he date of last insurance is the last date an individual is eligible to receive DIB in view of her earnings record. Thus, the

claimant must establish disability on or before that date in order to be entitled to DIB." *Michelle P. v. Berryhill*, No. 17-cv-4286 (HB), 2019 WL 1318352, at *1 n.4 (D. Minn. Mar. 22, 2019), *aff'd sub nom.*, *Palmer v. Saul*, 798 F. App'x 44 (8th Cir. 2020) (per curiam); *see also Turpin v. Colvin*, 750 F.3d 989, 993 (8th Cir. 2014) ("If an applicant for disability benefits is not insured for Title II purposes, then we only consider the applicant's medical conditions as of his or her date last insured."). As such, the relevant period for a DIB claim is the "period between [the claimant's] date of alleged onset of disability and the date she was last insured." *Reed v. Comm'r*, 750 F. App'x 506, 507 (8th Cir. 2019) (per curiam). Here, there is no dispute that Plaintiff's alleged onset date is May 10, 2019, and her date last insured is December 31, 2019. *See, e.g.*, Tr. 13, 15, 102-03, 119-21; Pl.'s Mem. in Supp. at 2, ECF No. 18; Def.'s Mem. in Supp. at 1, ECF No. 21.

It is true that the Eighth Circuit has repeatedly recognized that "[e]vidence from outside the insured period can be used in helping to elucidate a medical condition during the time for which benefits might be rewarded." *Cox*, 471 F.3d at 907 (quotation omitted); *see also, e.g.*, *Pyland v. Apfel*, 149 F.3d 873, 877 (8th Cir. 1998) ("Evidence of a disability subsequent to the expiration of one's insured status can be relevant, however, in helping to elucidate a medical condition during the time for which benefits might be rewarded."); *Basinger v. Heckler*, 725 F.2d 1166, 1169 (8th Cir. 1984) ("Nevertheless, medical evidence of a claimant's condition subsequent to the expiration of the claimant's insured status is relevant evidence because it may bear upon the severity of the claimant's condition before the expiration of his or her insured status."). Accordingly, while

4

Plaintiff is correct that the medical record should not be viewed "in isolation," Pl.'s Mem. in Supp. at 25, the nature of DIB means that Plaintiff's claim turns, respectfully, on an approximately eight-month period of time.

### B. 2019

Among other things, Plaintiff has a history of fibromyalgia, chronic pain, neuropathy, anxiety, depression, and posttraumatic stress disorder. *See, e.g.*, Tr. 7, 829-32, 817-28, 813-14, 785-812, 776-83, 765-66, 757-64, 753-56, 748-50, 742-745, 730, 620; *see also generally, e.g.*, Tr. 521-68, 839-47, 380-385, 407-10, 413-23, 436-38, 1015-24, 934-1010. Since 2016, Plaintiff has had a 100% service-connected[1] disability rating based on fibromyalgia, neuropathy in her hands and feet, and depression. Tr. 1229-30; *see* Tr. 472, 520; *see generally* Tr. 1116-1228, 1236-42. Since 2014, Plaintiff has been treated by John W. Lichtsinn, MD, for depression "as well as symptoms of anxiety and panic disorder." Tr. 620; *accord* Tr. 504, 493.

### 1. Pre-Onset

Between January and March 2019, Plaintiff was seen between one and three times per month for microcurrent treatment and chiropractic care related to pain in her upper and lower back, neck, feet, and hands as well as numbness in her feet. Tr. 915-33.

In mid-January, Plaintiff was seen in follow up for surgery on her right foot approximately six weeks prior. Tr. 742; *see generally* Tr. 425-29. She was noted to be doing "extremely well," with "minimal pain." Tr. 742. Plaintiff was instructed to begin

---

[1] As the Court previously noted, Plaintiff is a veteran of the Gulf War era and served in Iraq. *See, e.g.*, Tr. 525, 527, 533, 535, 1168, 1176-77, 1180, 1190, 1202, 1214, 1224, 1236. The Court again thanks Plaintiff for her service.

"partial weight-bearing," beginning at 50% for the next two weeks in her post-operative shoe; proceed to full weight-bearing in her post-operative shoe for another two weeks; and then transition to full-weight bearing in a regular shoe.  Tr. 743.  Plaintiff was to follow up again in six weeks.  Tr. 743.  Plaintiff was advised that she should avoid driving until "she can at least be full weight-bearing on that foot."  Tr. 743.

At the end of January, Plaintiff met with Dr. Lichtsinn for psychiatric care.  Tr. 737.  Plaintiff reported that she was doing "pretty good" and "recovering well" from her foot surgery. Tr. 738.  Plaintiff's mother had stayed with her while she was recovering, which "helped ward off depression."  Tr. 738; *see also* Tr. 736.  Plaintiff reported that she was "[g]oing to Bismarck to watch her sister's kids in mid-February."  Tr. 739; *see also* Tr. 735 ("traveling mid-Feb for several weeks to visit family in Bismarck and Billings").  Plaintiff started taking a SAMe[2] supplement in early January, but had not noticed improvement yet. Tr. 738.  Plaintiff rarely took lorazepam.[3]  Tr. 739.

Plaintiff was alert and oriented with normal speech and no noted cognition or memory problems.  Tr. 740.  Her mood was "okay" and her affect was noted to be "[r]elatively euthymic" with "minimal tearfulness."  Tr. 740; *see also* Tr. 736.  Her insight and judgment were "good."  Tr. 740.  Dr. Lichtsinn included posttraumatic stress disorder and depression in Plaintiff's diagnoses and noted that, while Plaintiff

---

[2] SAMe is an abbreviation for S-Adenosyl-L-methionine, "a chemical that is found naturally in the body" and "sold in the United States as a dietary supplement."  *S-Adenosyl-L-Methionine (SAMe): In Depth*, Nat'l Ctr. for Complementary & Integrative Health, Nat'l Institutes of Health, U.S. Dep't of Health & Human Servs., https://www.nccih.nih.gov/health/sadenosylmethionine-same-in-depth (last accessed July 26, 2023).

[3] "Lorazepam is used to relieve anxiety" and "works by slowing activity in the brain to allow for relaxation." *Lorazepam*, MedlinePlus, Nat'l Lib. of Med., Nat'l Institutes of Health, U.S. Dep't of Health & Human Servs., https://medlineplus.gov/druginfo/meds/a682053.html (last accessed July 26, 2023).

"[c]ontinues to struggle with ongoing anxiety and depression, . . . [she] has noted more stability recently." Tr. 740. Plaintiff was to return in two months. Tr. 740.

During an integrative health visit the next day, Plaintiff similarly reported that she was unsure if the SAMe supplement was helping with her mood, but thought her energy was "a bit improved." Tr. 734-35. Plaintiff also had been "using her light box daily" until approximately two weeks ago. Tr. 735. Plaintiff was experiencing "less overall body pain and better sleep" since making changes in her diet. Tr. 735. Plaintiff reported sleeping approximately nine hours per night. Tr. 735. While mornings remained a challenge and "getting out of bed [wa]s tough," "things [we]re fine" once she was "up for the day." Tr. 735. Plaintiff was "[c]onversant, appropriate," and in no acute distress. Tr. 736. She was also noted to be "engaged" with "less tearfulness." Tr. 736. Plaintiff was advised to increase her SAMe dose, resume use of her light box, and work on being active and "getting out daily." Tr. 736.

During her next integrative health visit approximately two weeks later, Plaintiff's mood was "not so good" and she felt "more tearful." Tr. 732; *see also* Tr. 734 ("easily tearful"). Plaintiff had run out of the SAMe supplement and still was unsure whether it was helping. Tr. 732. Plaintiff also had been forgetting to use her light box. Tr. 732. Plaintiff reported this was "a challenging time given that she has been alone for a while" and due to her upcoming travel, which "always makes her anxious and stressed." Tr. 732. Plaintiff was, however, looking forward to seeing her family. Tr. 732.

At her three-month follow-up appointment for her foot surgery, Plaintiff reported that she "has recently started full[-]weight bearing and return to normal ambulation, and

the pain has been progressive, worsening in the last week." Tr. 729; *see also* Tr. 730 ("Pain in arch and lateral right foot when standing on toes."). Plaintiff "experience[d] some throbbing pain at rest, which improve[d] after periods of non[-]weightbearing." Tr. 729. Plaintiff rated her pain at 5/10. Tr. 729. Imaging showed that Plaintiff's "fusion appears stable with haziness at fusion area indicating new bone formation." Tr. 730. It was noted that "[p]ain is expected with initial weight bearing" and Plaintiff was referred to physical therapy for a consultation. Tr. 730. "[N]ew rocker bottom shoes with prosthetics" were also ordered for Plaintiff. Tr. 730.

Plaintiff met with physical therapy the same day. Tr. 725. It was noted that Plaintiff ambulated with an antalgic gait and had decreased stance time in her right lower extremity. Tr. 727; *see* Tr.728 ("Pt presents to PT with impairments in gait, LE strength, flexibility and proprioception limiting ambulation, exercise, community mobility . . . ."). Among other things, Plaintiff was advised to use a cane to help with gait training. Tr. 728. During additional visits in March and April, Plaintiff reported that her pain was about the same, but she felt like she was improving and getting stronger. Tr. 714-16, 707-10. Plaintiff was, however, experiencing some tingling in her foot. Tr. 708. In April, it was noted that Plaintiff's gait had improved and there was "minimal evidence of antalgic gait." Tr. 708.

When Plaintiff met with integrative health in mid-March, she reported "lots of additional stressors" related to finances and family. Tr. 716. Despite these stressors, Plaintiff "report[ed her] sleep is overall better and she has noticed lately that the 'shooting pain' in her . . . legs has not been present." Tr. 716; *see also* Tr. 718. Plaintiff

8

reported that "she has been cancelling appointments less and has been working closely with an [a]unt on her house, a goal she has had for some time." Tr. 717; *see also* Tr. 718. While Plaintiff was "[e]ncouraged by these positives," she "remain[ed] easily over-whelmed and notably more readily tearful, as well as fatigued." Tr. 717; *see also* Tr. 718. Plaintiff was directed to continue with the SAMe supplement and add in vitamin B-12 along with relaxation exercises, following up with her psychologist, and focusing more on spending time with her aunt, nieces, and nephews. Tr. 718.

Plaintiff saw Dr. Lichtsinn again at the end of March. Tr. 710. Plaintiff reported that things were "okay – not great, not bad" and that she was anxious for her trip to Bismarck. Tr. 712. Plaintiff's relationships with her "mother and sister ha[d] been good recently." Tr. 712. Overall, Plaintiff was still unsure of the efficacy of the SAMe supplement. Tr. 712. While Plaintiff "ha[d] noticed some good things – other people she trusts have told her she looks better," there were "other things that have not improved." Tr. 712. Plaintiff reported that she "[c]ontinues to have crying spells" and "[w]ill occasionally go days without bathing." Tr. 712. Plaintiff's mental status examination was the same as it had been previously. *Compare* Tr. 713 *with* Tr. 740. Dr. Lichtsinn noted that although Plaintiff "[c]ontinues to struggle with ongoing anxiety and depression, . . . [she] has noted more stability recently." Tr. 713.

Plaintiff met with integrative health in the beginning of April. Tr. 705. Plaintiff overall reported that "things are largely 'unchanged.'" Tr. 705. She "did not want to come today but she did and is happy about that." Tr. 705. Plaintiff had "been really busy and travelling, which she note[d] typically results in set-backs." Tr. 705. Plaintiff really

enjoyed spending time with her family in Bismarck and "also got together with girlfriends on 3 occasions which is 'unheard of,' really enjoying each of them." Tr. 705; *see* Tr. 706 ("Continues to report increased engagement both with others and with projects."). Plaintiff was also "looking forward to mushroom hunting and several camping trips she has set up." Tr. 705. Plaintiff continued to "[r]emain[] frustrated with easy tearfulness, desire to stay at home since her return and notable increase in pain." Tr. 705; *see* Tr. 706 ("[C]ontinues to struggle with easy tearfulness and fatigue/desire to lay low at home."). Plaintiff's pain "[c]omes and goes, describes as a 'flare.'" Tr. 705. Plaintiff was also experiencing stiffness in her lower extremities. Tr. 705. Plaintiff "[n]ote[d] that most of this was greatly reduced or gone when her diet was better," and admitted that sticking to her regime was challenging when traveling. Tr. 705; *see also* Tr. 707. Plaintiff was encouraged to "pac[e] activity to decrease Fibromyalgia/pain flares." Tr. 706. As for her tearfulness, the "possibility that [this] may represent a need to release-emotion, past harms or trauma" was discussed and Plaintiff was provided information "on forgiveness and journaling to explore" and encouraged to do yoga. Tr. 707.

### 2. May

At her physical therapy appointment at the beginning of May, Plaintiff "report[ed] increased whole body/fibromyalgia pain over the past few weeks making it difficult to complete [her home exercise program]." Tr. 701. Plaintiff did, however, feel that the tingling her foot "may be slightly improved since [her] last session." Tr. 701. Plaintiff was worried about her "camping/mushroom hunting plans for the upcoming 4 weekends"

and being able to participate in these activities.  Tr. 701.  Plaintiff's gait was noted to be mildly antalgic and she was described as making "very slow progress toward goals – complicated by chronic/widespread pain in setting of fibromyalgia" but with overall improvement in her gait, strength, and balance.  Tr. 702.

Towards the end of May, Plaintiff was seen for a routine health exam.  Tr. 692. Among other things, it was noted that Plaintiff experienced chronic pain issues, including "right midfoot arthritic changes consistent with neuropathic arthropathy"; "sensory motor poly neuropathy, likely hereditary"; and "multiple other areas of pain including hands, base of the thumbs, both wrists, neck, [and] low back."  Tr. 695.  It was noted that Plaintiff had previously been diagnosed with fibromyalgia, which she was managing without medication due to side effects.  Tr. 695.  Plaintiff was "[w]eepy throughout the visit" and stated she did not know why she was crying.  Tr. 698; *see also* Tr. 697.

### 3.  June

When Plaintiff met with Dr. Lichtsinn in early June, she was "struggling lately – a lot of ups and downs."  Tr. 690.  Plaintiff's anxiety was "higher, which is not usual for her," and she was "[c]rying more."  Tr. 690.  Plaintiff felt like she was "avoiding people," including "not answering [her] sister's phone calls," and "[s]truggling to find energy to do things she loves, including mushroom hunting."  Tr. 690.  Plaintiff was also no longer taking the SAMe supplement and commented that "she has been avoidant of [her] therapist . . . , but for no particular reason."  Tr. 690.  Plaintiff was interested in restarting therapy.  Tr. 690.  Dr. Lichtsinn described Plaintiff's mood as "[n]ot good" and her affect as "[t]earful."   Tr. 691.   Dr. Lichtsinn discussed potential medication options with

11

Plaintiff, which she wanted to think about.  Tr. 692.  Plaintiff was encouraged to reconnect with her therapist.  Tr. 692.

At her six-month surgical follow-up appointment, Plaintiff was "[o]verall improving slowly."  Tr. 686; *see also* Tr. 685.  Plaintiff "continue[d] to have some pain and stiffness particularly on the dorsum of the foot as well as occasional symptoms of paresthesias extending into the lateral 3 toes."  Tr. 685.  Plaintiff "attempted shoe modifications with custom inserts and rocker bottom over-the-counter shoes," but found the shoes were "uncomfortable."  Tr. 685.  Plaintiff was "us[ing] a TENS machine and ha[d] attempted low current electrical treatment with reasonable results."  Tr. 686.  She was also continuing with physical therapy.  Tr. 686.  Plaintiff was "able to ambulate in standard footwear."  Tr. 686.  Upon examination, the surgical incision was well-healed and Plaintiff had "minimal tenderness" in the area.  Tr. 686.  She had full strength in her ankle and toes, but was noted to have "a positive Tinel's at the superficial peroneal nerve at the level of and lateral to her incision."  Tr. 686.

At her next physical therapy appointment in early June, Plaintiff similarly reported that the TENS unit helped with her foot pain.  Tr. 683-84.  Plaintiff continued to experience "difficulty descending stairs to get her laundry" and had "not spen[t] as much time doing [her home exercise program]" due to "widespread fibromyalgia pain [that] has been flared up for the past couple of months."  Tr. 683.  Plaintiff also noticed pain in her hips and thighs "after sleeping on a harder bed while camping," which was "worse at night and early in the morning" and improved after moving around one to two hours in

the morning.  Tr. 683; *see also* Tr. 684.  Plaintiff continued to have a mild antalgic gait. Tr. 683.

When she met with integrative health at the end of June, Plaintiff "continue[d] to struggle with depression with symptoms of low energy, lack of motivation, loss of interest to do things she typically enjoys and easy tearfulness more prominent."  Tr. 680; *see* Tr. 682 ("Reports depressive symptoms more prominent since last visit.").  A trip to Bismarck the week prior "helped get her 'out of the funk' for a bit" and Plaintiff "[e]njoyed time with her niece," but "did not engage with friends or get out much."  Tr. 680; *see* Tr. 682.  Plaintiff's "[s]ymptoms [were] returning now that [she] is home."  Tr. 680.  Plaintiff's mood was "sad" and her affect was "congruent."  Tr. 681.  Among other things, Plaintiff was encouraged to follow up with her psychologist and engage in physical activity.  Tr. 682.  Plaintiff's treatment provider also began "to explore [Plaintiff's] strong resistance to stillness" as she "[r]eport[ed] that any quiet, reflective activities cause her physical anxiety and restlessness-emotions 'get too strong' and [she] pushes away."  Tr. 682.

### 4.  July

In early July, Plaintiff reconnected with her psychologist Beret A. Skroch, Psy.D., LP, for treatment of depression and anxiety.  Tr. 679-80.  Plaintiff was "feeling more anhedonic, [with] lower energy."  Tr. 680.  Plaintiff reported that "[s]he has been trying to do one thing per day and having a hard time."  Tr. 680.  Grief was also inferring.  Tr. 680.  Plaintiff also reported that she had "just started a new antidepressant medication," which she was "tolerating so far and [wa]s motivated to continue."  Tr. 680.  Skroch

noted that Plaintiff's "[m]ood was dysphoric with congruent affect." Tr. 680. Skroch listed Plaintiff's diagnosis as recurrent major depression and directed her to follow up in one month. Tr. 680.

During physical therapy appointments in early and mid-July, Plaintiff was noted to have a mild antalgic gait. Tr. 674, 677. Plaintiff "report[ed] slow/gradual improvement in foot/ankle pain although pins/needles persist." Tr. 677. Plaintiff's hip and thigh pain had decreased, but she experienced a "general increase in widespread pain/fibromyalgia in [the] context of [a] recent depression exacerbation." Tr. 677. It was noted that Plaintiff had "been out of town recently and also report[ed an] increase in depression recently lending to less frequent [home exercise program] and use of [the] TENS [unit]." Tr. 677. Plaintiff was interested in Neurolumen treatment, which "utilizes laser therapy, light therapy and electrical stimulation." Tr. 677-68. At her next session approximately three weeks later, however, Plaintiff had not noticed a significant change in her lower extremity pain and functioning after using Neurolumen. Tr. 674. Plaintiff also reported increased neck pain and noticed some improvement from her home exercise program. Tr. 674.

Towards the end of July, while at an appointment to address an unrelated condition, Plaintiff discussed the recent increase in neck pain. Tr. 669. It was noted that Plaintiff had "a history of widespread myofascial pain as well as . . . hereditary peripheral neuropathy." Tr. 669. Upon examination, Plaintiff was noted to have "spasm involving the trapezius muscles bilaterally." Tr. 672. Plaintiff expressed interest in a muscle

relaxant and was prescribed cyclobenzaprine.[4]    Tr. 669, 672.    Plaintiff was also encouraged to follow up with physical therapy to address her neck pain.  Tr. 673.

At her next physical therapy session at the end of July, Plaintiff reported that her neck pain had improved with her home exercise program "and self-management strategies."  Tr. 665.  She also reported having overall improved pain "for a couple of days after last session."  Tr. 665.  Plaintiff was walking her dog and riding her bike more. Tr. 665.  She sometimes had increased pain after walking her dog.  Tr. 665.  Her gait was still noted to be mildly antalgic.  Tr. 666.  Plaintiff continued with Neurolumen treatment. Tr. 666-67.

### 5. August

Plaintiff met with both Dr. Lichtsinn and Skroch in early August.  Tr. 661-65. When she saw Dr. Lichtsinn, Plaintiff reported that she was doing "pretty good"; she "had a couple [of] 'down days,' but overall thinks 'things are improving.'"  Tr. 663. Plaintiff had "been more active, walking dog daily, biking to appts and other places."  Tr. 663.  She also felt that things were "pretty good" overall health-wise as well, noting that her pain flares were "'leveling out' but still present from time to time."  Tr. 663.  Plaintiff experienced "[s]ome difficulties socially" when she "had to break plans with a friend the other day as she was not feeling well."  Tr. 663.  Plaintiff was also frustrated by the denial of disability benefits.  Tr. 663.  Dr. Lichtsinn described Plaintiff's mood as "[a]

---

[4] "Cyclobenzaprine is used with rest, physical therapy, and other measures to relax muscles and relieve pain and discomfort caused by strains, sprains, and other muscle injuries."  *Cyclobenzaprine*, MedlinePlus, Nat'l Lib. of Med., Nat'l Institutes of Health, U.S. Dep't of Health & Human Servs., https://medlineplus.gov/druginfo/meds/ a682514.html (last accessed July 26, 2023).  "It works by acting in the brain and nervous system to allow the muscles to relax."  *Id.*

little better," noting she was "[t]earful at times."  Tr. 664.  Plaintiff was tolerating vortioxetine[5] well, despite some initial nausea and vomiting.  Tr. 663-64.

Similarly, Plaintiff told Skroch that she was "feeling a little better lately, likely due to the medication."  Tr. 661.  Plaintiff had "done good work with pacing" and was also "[b]eing mindful of her energy and scheduling accordingly."  Tr. 661.  While Plaintiff's sleep had improved some, she recently "noticed some gasping for air in her sleep" and was going to speak with her primary care provider about a sleep study.  Tr. 661.  Skroch described Plaintiff's mood as "fair with a [a] congruent affect."  Tr. 661.

### 6. September

When Plaintiff next saw Skroch in mid-September, she was "having a pain and depression flare-up."  Tr. 660.  Skroch assisted with plans to address such flare-ups and helped Plaintiff identify "coping skills and supports."  Tr. 660.  Plaintiff's "[m]ood was dysphoric with [a] congruent affect."  Tr. 660.

Towards the end of September, Plaintiff had another follow-up appointment related to her foot surgery.  Tr. 658.  Plaintiff reported "moderate discomfort with weight-bearing," "primarily with ambulation and push-off, especially with stairs but is not painful while nonweightbearing or with palpation."  Tr. 658; *see also* Tr. 659.  Plaintiff "managed her symptoms with custom orthotics and over-the-counter anti-inflammatory medications with moderate relief."  Tr. 658.  Plaintiff had "moderate pain on exam and with ambulation of [the] first tarsometatarsal joint with moderate

---

[5] "Vortioxetine is used to treat depression in adults" and "works mainly by increasing the amount of serotonin, a natural substance in the brain that helps maintain mental balance." *Vortioxetine*, MedlinePlus, Nat'l Lib. of Med., Nat'l Institutes of Health, U.S. Dep't of Health & Human Servs., https://medlineplus.gov/druginfo/meds/a614003.html (last accessed July 26, 2023).

osteoarthritis noted on [the] x-ray." Tr. 659.  She also had "mild paresthesias about her incisions."  Tr. 659.  Plaintiff was directed to "continue weight-bearing as tolerated"; "use . . . orthotics, NSAIDs and elevation to prevent pain and swelling"; and return for additional follow-up in December "at her one-year anniversary of surgery."  Tr. 659.

Plaintiff had her last physical therapy appointment the same day.  Tr. 655-57. Plaintiff reported that her "foot pain is slowly improving – less tingling/numbness but persistent pain with standing and walking."  Tr. 655.  Plaintiff continued to endorse increased depression and widespread chronic pain, which interfered with her ability to consistently perform her home exercise program.  Tr. 655.  As part of a pain assessment, Plaintiff reported that her pain interferes quite a bit with her day-to-day activities, recreational activities, and tasks at home.  Tr. 655-56.  Plaintiff's pain somewhat interfered with her enjoyment of life and interfered a little bit with her ability to concentrate.  Tr. 655.

Plaintiff was noted to ambulate "without significant gait deviation."  Tr. 656. Plaintiff's home exercise program was reviewed and just a few exercises were emphasized for ongoing rehabilitation.  Tr. 657.  Proper footwear and orthotics along with pacing of activities were discussed, "specifically talk[ing] through/problem[-]solv[ing] household chores (vacuuming, cooking, laundry)."  Tr. 657.  The importance of continuing to follow-up with her mental-health providers was discussed to help with the management of her chronic pain.  Tr. 657.  Plaintiff was also encouraged to do tai chi and yoga.  Tr. 657.  Discharge notes reflect that Plaintiff "demonstrated slow/gradual

17

improvements" in ankle range of motion, lower extremity strength, balance, and gait. Tr. 657.

Plaintiff subsequently had a sleep study performed. Tr. 654, 405; *see* Tr. 569-79. Plaintiff noted that she had "constant fatigue" and "irregular sleep." Tr. 569; *see* Tr. 577, 579; *see also* Tr. 648, 634, 636-37. Plaintiff noted that she slept "too much," approximately 10 hours nightly, and took a two-hour nap twice per week on average. Tr. 569; *see* Tr. 570, 571, 579; *see also* Tr. 649, 647. Plaintiff was diagnosed with mild sleep apnea and it was recommended that she try auto-titration positive air pressure. Tr. 573, 654, 648.

### 7. October

Plaintiff had an appointment with sleep medicine in mid-October to discuss the results of her sleep study. Tr. 648. To address Plaintiff's mild sleep apnea, she was referred "to sleep dentistry for [the] fitting of a mandibular advancement device." Tr. 653; *see* Tr. 634-39, 401-05 (appointment to obtain DynaFlex device), 628-29, 386 (device delivery). To address her chronic fatigue, Plaintiff was prescribed melatonin, advised to "us[e] her light box for at least 30 min[utes] each morning upon awakening," and referred for cognitive behavioral therapy for insomnia. Tr. 653.

When she met with Skroch the same day, there was no change in Plaintiff's mood and she reported "having a hard few weeks" with certain compulsive behavior. Tr. 647; *accord* Tr. 400. Skroch provided Plaintiff with information on cognitive behavioral therapy for insomnia. Tr. 648, 400. Plaintiff was also to "restrict sleep to 8.5 hours and keep [a] consistent wake-up" time as well as keep a sleep log. Tr. 648; *accord* Tr. 400.

Plaintiff met with Dr. Lichtsinn in mid-October.  Tr. 640, 395.  Plaintiff reported that she was "okay, especially the last few days."  Tr. 645; *accord* Tr. 398.  Plaintiff's mood had been lower, however, the previous week.  Tr. 645, 398.  Plaintiff overall felt she had been less tearful and did "not think it is blunting of emotions."  Tr. 645; *accord* Tr. 398.  Plaintiff reported that her uncle was diagnosed with pancreatic cancer and, as she "is very close to her aunt," this "has been hard."  Tr. 645; *accord* Tr. 398.  Plaintiff was looking forward to going to Florida "to visit [a] good friend for a week."  Tr. 645; *accord* Tr. 398; *see* Tr. 640.  Dr. Lichtsinn noted that Plaintiff's mood was "[a] little bit better" and she was "[m]inimally tearful."  Tr. 646; *accord* Tr. 399.

### 8.  November

When she saw Skroch at the beginning of November, Plaintiff had returned from Florida and had "lots of fun being in nature and active."  Tr. 640; *accord* Tr. 394.  Plaintiff reported that she was "feeling pretty good."  Tr. 640; *accord* Tr. 394.  While Plaintiff had been "tired the past two days, . . . [she wa]s getting her energy back now."  Tr. 640; *accord* Tr. 394.  Skroch reviewed Plaintiff's sleep log with her, and noted that she was "typically sleeping 10-hour days."  Tr. 640; *accord* Tr. 394.  Plaintiff agreed to experiment with getting up at 9:00 a.m. and going to bed by 12:00 a.m.  Tr. 640, 395.

At her next appointment with Skroch approximately two weeks later, Plaintiff reported that her uncle was in hospice and "she has been a primary support for her beloved aunt."  Tr. 632; *accord* Tr. 390.  Plaintiff felt good about "stepping up for her aunt" and acting in this supportive role.  Tr. 632-33; *accord* Tr. 390.  Plaintiff also "noticed decreased tearfulness with her new medication."  Tr. 632; *accord* Tr. 390.

Plaintiff was interested in "more mindfulness training." Tr. 633; *accord* Tr. 390. Skroch noted that Plaintiff's "[m]ood was positive with [a] congruent affect" and her depression was improving. Tr. 633; *accord* Tr. 390; *see also, e.g.*, Tr. 627, 626 (depression improving).

### 9. December

In early December, Plaintiff had her one-year follow-up appointment in connection with her foot surgery. Tr. 630, 387. Plaintiff was "[o]verall doing well, [and] continues to improve." Tr. 630; *accord* Tr. 387; *see* Tr. 631, 385. Plaintiff felt that "she is better than preoperatively" and had "been increasing her activity and walking." Tr. 631; *accord* Tr. 388. Plaintiff had "occasional issues," including "slight paresthesias to the dorsum of her foot," but reported "this is not problematic for her" and "she rarely thinks about it." Tr. 631; *accord* Tr. 388. Plaintiff "continue[d] to wear supportive footwear with her orthotics and carbon fiber insoles," but was "not taking any pain medication." Tr. 631; *accord* Tr. 388. Plaintiff's fusion was "solid." Tr. 632; *accord* Tr. 388. Plaintiff could "have activity as tolerated with no dedicated orthopedic follow-up needed." Tr. 632; *accord* Tr. 388.

At her next appointment with Skroch in early December, Plaintiff reported that her uncle had passed away. Tr. 630; *accord* Tr. 389. Plaintiff felt "good that she was there to help her [a]unt and family." Tr. 630; *accord* Tr. 389. Plaintiff thought "the new medication [wa]s helping keep her mood more stable." Tr. 630; *accord* Tr. 389. Plaintiff had some concerns about certain compulsive behavior and "many triggers now" present. Tr. 630; *accord* Tr. 389. Skroch focused on ways to identify and minimize those triggers

and support options.  Tr. 630; *accord* Tr. 389.  Plaintiff's mood was again "positive with [a] congruent affect."  Tr. 630; *accord* Tr. 389.

When Plaintiff next saw Skroch in mid-December, she was "having a tough two weeks" as this "time of year is an anniversary of the death of one of her special military friends/loves."  Tr. 627; *accord* Tr. 385.  Plaintiff "shared about the loss and her grief over the past 16 years."  Tr. 627; *accord* Tr. 385.  Plaintiff felt "stuck."  Tr. 627; *accord* Tr. 385.  Skroch discussed ways Plaintiff "might celebrate his life" and "say goodbye." Tr. 627; *accord* Tr. 385.  Plaintiff had "been activating despite wanting to stay in bed" and had "signed up to volunteer."  Tr. 627; *accord* Tr. 385.  She also "interacted socially on many occasions" and was "planning for Christmas."  Tr. 627; *accord* Tr. 385. Plaintiff's sleep had also "been better."  Tr. 627; *accord* Tr. 385.  Skroch described Plaintiff's mood as "fair with [a] congruent affect."  Tr. 627; *accord* Tr. 385.

At their next appointment at the end of December, "[t]hings ha[d] improved lately" for Plaintiff.  Tr. 626; *accord* Tr. 491.  She had "an active holiday with her family."  Tr. 626; *accord* Tr. 491.  While Plaintiff had isolated more over the past two days, she was "connecting again with her family today and tomorrow."  Tr. 626; *accord* Tr. 491.  Plaintiff also expressed interest in attending the next mindfulness-based stress reduction group session.  Tr. 627; *see* Tr. 625-26, 623, 506, 512-13 (attendance at sessions).  Skroch "[p]rovided reinforcement, even for the alone times when [Plaintiff] recharges."  Tr. 626; *accord* Tr. 491.  Plaintiff's mood was again "fair with [a] congruent affect."  Tr. 626; *accord* Tr. 491.

### 10. Post Date Last Insured

Plaintiff saw Skroch twice in January 2020.  Tr. 621-22, 488, 490, 508.  In mid-January, Plaintiff reported that she had been missing social interactions due to being sick with a cold for the past two weeks.  Tr. 622, 490, 508; *see generally* Tr. 509-12.  Plaintiff noted that she was going to be traveling to Florida again to spend time with friends.  Tr. 622, 490, 509.  The second visit was an "early . . . follow-up" as Plaintiff had been "having a difficult past four days."  Tr. 621; *accord* Tr. 488, 506.  Plaintiff was, however, "feeling much better" that day.  Tr. 621; *accord* Tr. 488, 506.  Plaintiff "explained that her schedule for watching her nieces was changed last minute and then her sister acted in an insensitive way."  Tr. 621; *accord* Tr. 488, 506.  Plaintiff was "worried that her sister was mad at her" and the situation "triggered anxiety and depression."  Tr. 621; *accord* Tr. 488, 506.  Skroch encouraged Plaintiff to "consider[] different ways of responding to these sorts of situations."  Tr. 621; *accord* Tr. 488, 506.  At each visit, Plaintiff's mood was "fair with [a] congruent affect," and, in addition to her depression improving, Skroch noted that Plaintiff's posttraumatic stress disorder was improving as well.  Tr. 622, 621-22, 488, 506.

Around the end of January, it was noted that Plaintiff missed the mindfulness-based stress reduction class because she "felt too anxious to leave the house."  Tr. 505.

Plaintiff saw Dr. Lichtsinn in early February.  Tr. 617, 501.  She had "'not been doing as well' over [the] past month."  Tr. 617; *accord* Tr. 502.  She was "[m]ore tearful, more fatigued, cancelling appts, not leaving [the] house as much," and "[n]ot going to bed until late (2-3AM), and then sleeping in."  Tr. 618; *accord* Tr. 502; *see* Tr. 620

("Struggling with leaving house, socializing."), 504 (same). Plaintiff found "herself 'zoning out on [her] couch, stuck on social media' – is [sic] many hours daily." Tr. 618; *accord* Tr. 502. Plaintiff did go to Florida and "had a good time" with "minimal" symptoms. Tr. 618; *accord* Tr. 502. "Within a couple of days being back, [her] depression returned." Tr. 618; *accord* Tr. 502. Plaintiff was interested in restarting low-dose naltrexone. Tr. 618. Dr. Lichtsinn noted Plaintiff's mood was "[n]ot great" and her affect was "[t]earful." Tr. 619; *accord* Tr. 503.

As part of a visit to reestablish care in mid-February, Plaintiff was wondering whether there was anything else she could try to address her fibromyalgia. Tr. 614. It was noted that Plaintiff previously tried gabapentin,[6] but gained weight. Tr. 614. Plaintiff's treatment provider noted that she was "already doing most things that I would recommend." Tr. 616. It was suggested that Plaintiff speak with her psychiatrist about "whether or not duloxetine may provider her more benefit than vortioxetine." Tr. 616. Plaintiff's treatment provider also suggested fish oil and turmeric as anti-inflammatory supplements and "[t]he Mediterranean diet is also an anti-inflammatory diet that some people find beneficial to follow." Tr. 616.

When Plaintiff saw Skroch again towards the end of February, they completed an assessment related to her posttraumatic stress disorder, "which brought up some emotions related to past trauma." Tr. 611; *see* Tr. 612-13. Plaintiff's "score had dropped significantly (28) since [her] last score in 2016 (47)." Tr. 611. "Depression [wa]s the

---

[6] Among other things, gabapentin can be "used to relieve the pain of postherpetic neuralgia (PHN; the burning, stabbing pain or aches that may last for months or years after an attack of shingles)," and works "by changing the way the body senses pain." *Gabapentin*, MedlinePlus, Nat'l Lib. of Med., Nat'l Institutes of Health, U.S. Dep't of Health & Human Servs., https://medlineplus.gov/druginfo/meds/a694007.html (last accessed July 26, 2023).

primary problem most days," and Plaintiff "shared evidence of improvement." Tr. 611. Plaintiff was "pushing herself to engage in life," and noted she was "volunteer[ing] for a veteran organization next week and feels good about that." Tr. 611. Plaintiff also "shared other social plans." Tr. 611. Skroch noted Plaintiff's mood was "fair with [a] congruent affect" and both her depression and posttraumatic stress disorder were noted to be improved. Tr. 612.

At the end of February, Plaintiff scheduled an appointment with integrative health to address feeling "increasingly down, less energy, low motivation, loss of interest and reclusive with increase in generalized fibromyalgia pain as well, worsening since December." Tr. 603; *see* Tr. 603 (noting last appointment in June 2019). Plaintiff reported that "she has 'fallen off the wagon' in terms of diet and activity and this always worsens [her] symptoms." Tr. 603; *see* Tr. 603 ("Currently eating a regular diet, including gluten. In past has felt much better off gluten, continues to question if dairy and eggs affect her as well."). Plaintiff was looking forward to traveling to Bismarck to visit her family in one month. Tr. 605. Plaintiff had begun the low-dose naltrexone in early February. Tr. 603. Plaintiff wanted to "'[g]et back on track' with diet/activity to address mood and pain." Tr. 604; *see also* Tr. 605.

Plaintiff's mood was "not good" and she was "tearful at times." Tr. 605. Plaintiff was noted to be experiencing "[w]orsening symptoms [of] depression since the holidays in the context of poor diet and lessened activity/engagement." Tr. 605. Plaintiff was directed to continue following up with her mental-health providers; continue with the low-dose naltrexone, which was noted to "target[] fibromyalgia pain" as well as mood;

advised on diet changes; and encouraged to engage in daily activity and "getting outside in nature regularly, which has consistently had positive effects on her mood." Tr. 605.

When Plaintiff next met with Skroch in early March, she had been "feeling down for a few days earlier this week," but was "feeling better" on the day of her appointment. Tr. 591. "There was no trigger as far as she could tell." Tr. 591. Skroch provided Plaintiff with strategies to "manag[e] these down days." Tr. 591. Plaintiff also wanted to "make changes to her diet," and Skroch "encouraged one change at a time." Tr. 592. Plaintiff's mood was again "fair with [a] congruent affect" and her depression and posttraumatic stress disorder described as improving. Tr. 592.

Plaintiff also followed up with sleep medicine in early March. Tr. 588. Plaintiff "report[ed] improvement in her ability to fall asleep and stay asleep; in bed about midnight, sleep latency of 15 min[utes]; wakes once per night and back to sleep without difficulty"; and "[w]akes between 10-11 am." Tr. 588; *see* Tr. 591 ("Her insomnia appears much improved."). Plaintiff "continue[d] to endorse fatigue." Tr. 588.

The mandibular advancement device was not working for Plaintiff, causing her to "wak[e] with pain [in] the morning and at times overnight." Tr. 588. Plaintiff thought it might need to be adjusted and made an appointment with dentistry. Tr. 588; *see* Tr. 591. To address her continued fatigue, it was recommended that Plaintiff "discuss a plan for circadian advancement with her individual therapist, incorporating her light box for at least 30 min[utes] each morning." Tr. 591.

Plaintiff saw Skroch next in early June. Tr. 892. She had "been more tearful over the past week and noticed that she's been lonely for her dog who passed away this last

winter." Tr. 892.  Plaintiff was also "notic[ing] more stress with COVID and recent civil unrest." Tr. 892.  Plaintiff had not "wanted to reach out to family" as "[s]ometimes she doesn't feel like they understand." Tr. 892.  Skroch encouraged her to "[c]onsider[] how she might help them understand how they can be helpful to her." Tr. 892.  Plaintiff's "[m]ood was mildly dysphoric with [a] tearful affect." Tr. 893.

Telephone notes from mid-June reflect that Plaintiff was experiencing increased fibromyalgia pain and pain in her feet. Tr. 888.  Plaintiff felt "like her feet are really stiff and she can't fully flex them." Tr. 888.  Her pain "varie[d] throughout the day." Tr. 888.  Plaintiff's weight had also increased by approximately 30 pounds. Tr. 888.  Plaintiff was "very tearful . . and note[d] she cries a lot," which "is somewhat 'par for the course.'" Tr. 888.  Among other things, Plaintiff was given foot exercises and prescribed methocarbamol[7] as a muscle relaxant. Tr. 889.

## IV. OPINION EVIDENCE

### A. Dr. Lichtsinn

In February 2020, Dr. Lichtsinn wrote a letter on Plaintiff's behalf. Tr. 620-21, 504, 793.  He noted that Plaintiff had been receiving mental-health treatment since 2004, and he had treated her since 2014. Tr. 620, 504, 493.  Dr. Lichtsinn stated that Plaintiff's "depression symptoms include chronic feelings of emptiness, sadness, negative ruminations, isolation, tearfulness, and suicidal ideation." Tr. 621; *accord* Tr. 504, 493.

---

[7] "Methocarbamol is used with rest, physical therapy, and other measures to relax muscles and relieve pain and discomfort caused by strains, sprains, and other muscle injuries," and "works by slowing activity in the nervous system to allow the body to relax." *Methocarbamol*, MedlinePlus, Nat'l Lib. of Med., Nat'l Institutes of Health, U.S. Dep't of Health & Human Servs., https://medlineplus.gov/druginfo/meds/a682579.html (last accessed July 26, 2023).

Dr. Lichtsinn further stated that Plaintiff "has been actively engaged in treatment during her time with our clinic, trying multiple medication interventions and psychotherapy modalities," and, "[d]espite these shared efforts, [Plaintiff] continues to have significant symptoms." Tr. 621; *accord* Tr. 504, 493. In light of Plaintiff's "chronic symptoms of depression, their significant effect on her daily functioning, and marginal benefit from evidence-based treatments, [Dr. Lichtsinn di]d not currently believe she is able to obtain and maintain employment." Tr. 621; *accord* Tr. 504, 493.

In May 2020, Dr. Lichtsinn completed a mental-residual-functional-capacity form. Tr. 849-52. When asked to indicate "for what period of time your assessment is applicable," Dr. Lichtsinn stated it was for December 18, 2014 through the present. Tr. 850. Dr. Lichtsinn was asked to opine on Plaintiff's abilities to make occupational adjustments, performance adjustments, and personal-social adjustments as well as perform other work-related activities, among other things. Tr. 850-52.

As for Plaintiff's ability to make occupational adjustments, Dr. Lichtsinn opined that her ability to follow work rules and use judgment was good; her ability to relate to coworkers and interact with supervisors was fair; and her ability to deal with the public, deal with work stress, function independently, and maintain attention/concentration was "[p]oor/or [n]one." Tr. 850. Dr. Lichtsinn explained that Plaintiff's "depression and anxiety symptoms have consistently presented barriers to gainful employment." Tr. 850. According to Dr. Lichtsinn:

> The primary barrier is her inability to cope with moment-to-moment stressors within the day. She is very easily distressed and anxious, sensitive to criticism, ruminative, and tearful.

27

> This subsequently affects concentration, ability to interact with the public/supervisors, and work independently. Additionally, presenting to work daily and on time has been a consistent barrier.

Tr. 850.

As for Plaintiff's ability to make performance adjustments, her abilities to understand, remember, and carry out simple and detailed but not complex job instructions was good. Tr. 850. In contrast, her ability to understand, remember, and carry out complex job instructions was fair. Tr. 850. Dr. Lichtsinn additionally explained that Plaintiff "has above average intelligence," but, "when under stress, thought organization, memory, comprehension, and subsequently work performance suffer." Tr. 851.

With respect to Plaintiff's ability to make personal-social adjustments, her ability to maintain personal appearance was fair. Tr. 851. Her abilities to behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability, however, were "[p]oor/or [n]one." Tr. 851. Dr. Lichtsinn explained that Plaintiff "is brought to tears very easily, unpredictably, and not necessarily related to something sad. This feature of her depression has certainly affected her ability to relate effectively in social situations. As noted earlier, presenting to work daily and on time has been a barrier to employment." Tr. 851.

Addressing other work-related activities, Dr. Lichtsinn opined that Plaintiff "struggles with chronic pain, which can severely inhibit her ability to work," noting that "[s]he has worked extensively with primary care and pain professionals at the VA." Tr.

851.    Dr. Lichtsinn opined that Plaintiff would be absent from work due to her impairments or treatment more than three times per month.  Tr. 852.

### B. November 2020 Functional Assessment

In November 2020, Plaintiff participated in a functional assessment.  *See generally* Tr. 898-914; *see also* Tr. 886.  As part of the assessment, Plaintiff reported that

> she lives in a single[-]level home with a finished basement. . . . [S]he is independent in [her activities of daily living] and household tasks but paces herself. . . . [S]he has difficulty with bending involved in laundry. . . . [S]he is "fine" with shopping but does only light shopping. . . . [S]he paces herself with errands as she only goes to one store per outing. . . . [S]he paces self such as doing one big activity per day. . . . [S]he reports she is independent in home maintenance but paces self and gets some help from her neighbor with snow removal. . . . [S]he is able to participate in leisure activities such as biking. . . . [S]he has limited social energy to engage with friends.

Tr. 912.  Plaintiff "was pleasant and cooperative with testing," though "tearful during the initial history taking when talking about the impact of her depression and fibromyalgia on her daily life and ability to work."  Tr. 903.  Plaintiff also reported that she "limited her outside activities including social events due to depression, anxiety and her pain associated with her fibromyalgia."  Tr. 903.

In relevant part, the assessment found that, in an eight-hour day, Plaintiff had "[s]light/[n]o limitation" in her ability to sit; could stand occasionally to frequently; and could walk occasionally.  Tr. 899.  As for standing, it was noted that Plaintiff had "[d]ecreased trunk endurance with . . . reports of increased low back pain."  Tr. 906.  It

29

was also noted that Plaintiff walked at a "[s]low pace" and recommended that Plaintiff "have the ability to self-pace with walking."  Tr. 906.

As for lifting and carrying, Plaintiff could occasionally carry 25 pounds and occasionally lift 10 pounds.  Tr. 899.  She could frequently and continuously carry and lift 0 pounds.  Tr. 899.  Plaintiff was able to use her hands for fine manipulation as well as both simple and firm grasping.  Tr. 899-900.  During one of the tasks, it was noted that Plaintiff had "slow pace [with her] right," and so it was recommended that she have "the ability to self-pace with right upper extremity coordination activities that require reaching."  Tr. 907.

Upon examination, Plaintiff's range of motion was within functional limitations for all areas and she had full muscle strength in all areas tested.  Tr. 908-10.  Plaintiff also "ambulate[d] with [a] symmetrical gait."  Tr. 908; *accord* Tr. 903.

### C. State Agency Consultants

#### 1. Medical Consultants

In relevant part, the state agency medical consultants found that Plaintiff had the ability to perform light work[8] and could stand/walk and sit with normal breaks for six

---

[8] As set forth in the regulations:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.

20 C.F.R. § 404.1567(b).

hours in an eight-day day.  Tr. 110-11, 127-28.  Plaintiff also had certain postural and environmental limitations.  Tr. 111-12, 128-29.  Plaintiff had no manipulative limitations. Tr. 111, 128.

## 2.  Mental-Health Consultants

In relevant part, the state agency mental-health consultants opined that Plaintiff had no understanding, memory, or social limitations, but did have limitations in her abilities to sustain concentration and persistence and adapt.  Tr. 112-13, 129-30.  The state agency mental-health consultants opined that Plaintiff

> can learn, remember and carry out at least 3 and 4[-]step tasks with adequate pace and persistence and sustain that level of performance.  She can interact appropriately with co-workers and supervisors despite a mild reduction in stress tolerance. She can tolerate the stressors of that level of work in a setting where tasks are not frequently changing.

Tr. 113; *accord* Tr. 131.

## V. DISABILITY FORMS & HEARING TESTIMONY

### A.  Disability Forms

As part of the disability-benefits process, Plaintiff completed a function report. *See generally* Tr. 294-301.  When asked how her conditions limit her ability to work, Plaintiff explained that she

> [c]annot concentrate, stay on task, pay attention.  Easily overwhelmed, cry at inappropriate times.  Somedays, I cannot summon the will to leave my house, even though I have tasks that I should get done.  This caused excessive absences from past work, and extended (months) absences using FMLA. Chronic pain makes me have to pace any physical jobs very carefully.  I cannot make even simple decisions on my bad days.

Tr. 294.  Plaintiff had difficulty being as active as she once was, managing her emotions, concentrating, working, attending social events, and keeping friends.  Tr. 295; *see* Tr. 299 ("All the physical tasks exacerbate my chronic pain.  Memory and concentration decreased."), (ability to pay attention "not long on many days"), 299 ("Greatly decreased my social activity.").  Plaintiff handled stress and changes in her routine "very poorly."  Tr. 300.

Plaintiff lived by herself in a house and took care of her dog.  Tr. 294, 295.  She noted difficulty falling asleep and then sleeping excessively between 10 and 12 hours per day.  Tr. 295.  Plaintiff sometimes neglected her personal care for up to five days, including bathing and washing her hair, as well as delaying haircuts.  Tr. 295-96.  Plaintiff prepared her own meals daily, but it took longer because she usually separated tasks with breaks in between.  Tr. 296.  Plaintiff could do laundry and mowing, but she had to pace herself, breaking things down into smaller tasks.  Tr. 296; *cf.* Tr. 296 ("I hire for yardwork, gutter cleaning, etc.").  Cleaning was often neglected and her mother and aunt would help her.  Tr. 296.  Plaintiff shopped for groceries, personal items, and household goods in person and online.  Tr. 297.  She shopped approximately once per week, choosing a grocery store that was "a smaller store with less walking."  Tr. 297.  Plaintiff also noted that she was "slow, indecisive."  Tr. 297; *see* Tr. 300 ("*Extreme* indecisiveness.  Cannot complete tasks, usually due to indecision.  Excessive clutter in my home.").

Plaintiff enjoyed watching television, using social media, reading, and looking for wild mushrooms.  Tr. 298.  Plaintiff went mushroom hunting approximately once or twice per month during the spring, summer, and fall.  Tr. 298.  Plaintiff noted that she now "spend[s] way less time mushroom hunting [and] outdoors." Tr. 298.  Plaintiff spent time attending medical appointments and seeing her sister, niece, and nephew approximately one to two times per week.  Tr. 298.  Plaintiff noted that she was "distant with family" due to isolating herself.  Tr. 299.

In a later report, Plaintiff reported that her depression, crying, isolation, posttraumatic stress disorder, and anxiety were worsening as of January 2020.  Tr. 311; *see* Tr. 314; *cf.* Tr. 331 (worsening in February 2020).  She noted that she was unable "to leave home on many days."  Tr. 314.

### B.  Hearing Testimony

#### 1.  Plaintiff's Testimony

At the hearing, Plaintiff testified that she lived alone and now had a service dog for "anxiety, going in public places and to help with panic attacks" as well as "companionship."  Tr. 58, 55; *see also generally* Tr. 1142-65.  Plaintiff testified that she traveled approximately 45 miles to train her dog approximately three times a week and they trained for approximately four hours at a time, taking breaks about every 30 minutes. Tr. 60, 65-66.  Initially, Plaintiff's neck pain was aggravated by all the time she spent looking down at the dog.  Tr. 65.  Plaintiff testified that no one helped her with "any grocery shopping or other household tasks."  Tr. 58.

33

Plaintiff testified about the physical and mental conditions that kept her from working. *See generally* Tr. 47-66. With respect to her mental conditions, Plaintiff testified that she can "become tearful on a dime" and has "a really hard time controlling [her] emotions." Tr. 47; *see* Tr. 49. Plaintiff testified that she "go[es] through a lot of waves of depression and anxiety." Tr. 47. When her depression was at its worst, she tended to isolate and it was "hard for [her] to leave [her] house." Tr. 47; *see* Tr. 48 ("[A]t least twice a year, sometimes three times a year where I'll just kind of go into like a more depressive period that can last for weeks or sometimes even a couple months."), 49 ("Then I just don't even want to get out of bed or leave my house or talk to anybody."). When her depression was at its best, Plaintiff testified that "the everyday thing is just sort of a lack of joy"; not having enthusiasm for things she normally would; and "feeling disconnected" from people. Tr. 48. Plaintiff also sometimes had panic attacks and controlled her environment to avoid trigger situations, such as shopping at times when crowds were not present. Tr. 47; *see* Tr. 50 (panic attacks twice per year).

Plaintiff testified that her conditions interfere with her attention span and motivation. Plaintiff testified that it "can be very hard to get anything done"; she will "kind of jump from project to project around the house" and feels like "everything just takes [her] a lot more time." Tr. 50. Plaintiff described herself as being "easily distracted" and that she "might lose focus." Tr. 50. As an example, Plaintiff testified that she "might look at [her] phone for something and then pretty soon an hour passes, and [she] just forgot what she was already doing." Tr. 50. Plaintiff also testified that stress

impacted her symptoms, making things worse.  Tr. 51.  Plaintiff testified that she cries, ruminates on what happened, gets upset, and shuts down.  Tr. 51.

Plaintiff was also asked about being hypervigilant in terms of her posttraumatic stress disorder.  Tr. 51.  Plaintiff testified that she "can be somewhat hypervigilant in outside situations," but otherwise her posttraumatic stress disorder was "usually mild unless something triggers it."  Tr. 51.  As an example, Plaintiff testified that she was having trouble getting rid of mice in her house in 2015.  Tr. 51.  Plaintiff testified:

> And then all of a sudden, I wasn't sleeping.  I just was looking all over the house all the time.  I was – I just couldn't relax and like watch TV.  I was just scanning the house, watching for a mouse in the – sounds really stupid, but it was so bad that that's when my fibromyalgia onset and . . . I felt like my mental health manifested into physical pain at that time from the hypervigilance and just having so much tension in my body.

Tr. 51.

Plaintiff testified that there is "always some level of pain throughout [her] body and different areas can be worse on different days."  Tr. 52.  Plaintiff's pain was primarily in her neck and hands, but also her "feet sometimes."  Tr. 52.  Plaintiff testified that she had trouble "grip[ping] things or things that need strength[] to like turn a jar lid or something like that."  Tr. 52.  Plaintiff testified that she sometimes wears braces when she drives, particularly for long distances, which helped her hands not to tense up as much around the steering wheel.  Tr. 52; *see* Tr. 300 (use of hand braces).  Plaintiff testified that she also paces herself with activities to minimize her symptoms, doing an activity for 10 to 15 minutes and then taking a break for 15 minutes.  Tr. 52-53.

Plaintiff also talked about her fatigue.  Tr. 54.  Plaintiff testified that "sometimes [she] just get[s] so tired that [she] just can't stay awake in the afternoon."  Tr. 54. Plaintiff napped approximately twice per week for 90 minutes at a time.  Tr. 54.  If she did not nap, Plaintiff testified that she gets "very cranky" and more sensitive, such as with sounds and less patience with her niece and nephew.  Tr. 55.

The ALJ asked Plaintiff about trips she had taken recently, including a trip to northern Minnesota in the summer of 2021.  Tr. 56.  Plaintiff went with her family and rode the gondola and as well as visiting the lakeshore and going out to eat.  Tr. 57. Plaintiff did a short hike, approximately 30 minutes, "with the kids" "just outside [the] condo."  Tr. 57.  Plaintiff elected to stay back and have "some quiet time" when the rest of her family spent the day in another town.  Tr. 57.  Plaintiff also went to California for two weeks in the summer of 2020 to help her aunt when a child was ill.  Tr. 56, 58. Plaintiff testified that she went camping once in May 2021, but had not gone the pervious two summers.  Tr. 59.  Plaintiff testified that she enjoyed hiking using a walking stick and hunting for mushrooms.  Tr. 59.

The ALJ also asked Plaintiff about caring for her school-age niece and nephew. Tr. 61-62.  In the summer of 2021, Plaintiff testified that she watched them overnight every two to three weeks, which was "not nearly as much as [she] used to."  Tr. 61-62. In the summer of 2020, Plaintiff "committed to doing their daycare one day a week basically while [they] were out of school."  Tr. 62.

## 2. Vocational Expert

At the hearing, the ALJ asked the vocational expert to assume a hypothetical individual of Plaintiff's same age, education, and work experience, who was capable of performing light work with the following additional limitations:

> [L]imited to only occasional kneeling, crawling or climbing. There can be frequent stooping, crouching and balancing. No exposure to potential workplace hazards such as moving machinery or unprotected heights. No exposure to vibration through use of tools or machinery. Only limited to moderate noise level environments. No fast-paced production requirements defined as work that would require more than frequent handling, fingering or reaching bilaterally. Limited to simple routine tasks with occasional interaction with coworkers and supervisors, and no interaction with the general public.

Tr. 68. The vocational expert testified that such an individual could not perform Plaintiff's past work, but could perform the representative jobs of merchandise marker, collator operator, and router. Tr. 68-69. The ALJ asked the vocational expert to assume the same hypothetical individual but that such individual was now capable of only sedentary work. Tr. 69. The vocational expert testified that such an individual could perform the jobs of document preparer, addresser, and tube operator. Tr. 70.

The vocational expert testified that the tolerance for absenteeism would be being gone one day per month. Tr. 71. The vocational expert additionally testified that, outside of normal breaks, the tolerance for being off task would be "up to a maximum of 15% of the day in increments of about six to ten minutes an hour," which he likened to "an extra bathroom break or something like that." Tr. 72. The vocational expert testified that crying was not generally tolerated during the day in the workplace. Tr. 80.

37

Throughout the vocational expert's testimony, the vocational expert testified that he was relying on both the job definition components present in the *Dictionary of Occupational Titles* ("DOT") and his own experience to account for the limitations identified by the ALJ and the number of jobs available. *See generally* Tr. 68-74. For example, as to the public-contact limitation, the vocational expert testified that he was using jobs where the fifth digit in the DOT definition was an 8, which meant that the individual was "working with things, not with people, as a function of the job duties" supplemented with his 35 years of experience assisting individuals with disabilities and injuries return to work. Tr. 69; *see* Tr. 72; *see also* Tr. 70-71 ("I'm also supplementing that with my skills, understanding, and education, training, especially for the no public part."). The vocational expert also based his testimony on the time allotted to be off task on his experience in placing individuals and working with employers, which required "going through issues such as the pace of the work and the tolerance for time off task." Tr. 73. On cross examination, the vocational expert acknowledged that there was not "really definitive government data" on the tolerance for being off task and that he had not done any specific market research in the area. Tr. 73. Similarly, the vocational expert acknowledged that there was "no published data" addressing the public-contact limitation, and his testimony was based on his experience with clients doing the job of merchandise marker and analyzing that job. Tr. 74.

## VI. ALJ'S DECISION

When rendering a decision on Plaintiff's DIB application, the ALJ noted that Plaintiff was not alleging disability during the previously adjudicated period, which

ended on May 9, 2019.  Tr. 13.  The ALJ found that Plaintiff had the severe impairments of fibromyalgia, arthritis in her right foot post-fusion surgery, neuropathy, tinnitus, posttraumatic stress disorder, and depression, and none of these impairments individually or in combination met or equaled a listed impairment in 20 C.F.R. pt. 404, subpt. P, app.1.  Tr. 16; *see* Tr. 16-20.  The ALJ found Plaintiff's sleep apnea was non-severe as "there [wa]s no indication in the treatment records that [Plaintiff] ha[d] more than minimal work-related limitation due to sleep apnea."  Tr. 16.  All other impairments "alleged and found in the record" were "non-severe or not medically determinable."  Tr. 16.

As to Plaintiff's residual functional capacity, the ALJ concluded that Plaintiff had the residual functional capacity to perform light work with the following additional limitations:

> limited to only occasional kneeling, crawling, or climbing; there can be frequent stooping, crouching and balancing; no exposure to potential workplace hazards such as moving machinery or unprotected heights; no exposure to vibration through use of tools or machinery; only limited to moderate noise level environments; no fast paced production requirements, defined as limited to simple, routine tasks, with occasional interaction with coworkers and supervisors, and no interaction with the general public.

Tr. 20.  The ALJ explained that Plaintiff "is restricted to light work, with additional postural and climbing restrictions, to accommodate her pain complaints and history of fusion surgery in two toes of the right foot."  Tr. 22.  Plaintiff was also "limited in terms of workplace hazards and exposure to vibration to accommodate [her] diagnosis of neuropathy, though there is little related to treatment or testing."  Tr. 22.  The pace

limitation was "to accommodate both neuropathy and mental health symptoms including anxiety." Tr. 22. Plaintiff was "limited with regard to overhead reaching bilaterally to accommodate pain and neuropathy." Tr. 22. Plaintiff was also "limited mentally in terms of complexity of tasks and social interaction, to accommodate her mental health impairments including anxiety." Tr. 22.

Based on Plaintiff's age, education, work experience, and residual functional capacity, the ALJ found that Plaintiff was capable of performing the representative jobs of merchandise marker, collator operator, and router. Tr. 33. Accordingly, the ALJ concluded that Plaintiff was not under a disability as of her date last insured. Tr. 34.

## VII. ANALYSIS

### A. Legal Standard

This Court's "task is to determine whether the ALJ's decision complies with the relevant legal standards and is supported by substantial evidence in the record as a whole." *Lucus v. Saul*, 960 F.3d 1066, 1068 (8th Cir. 2020) (quotation omitted); *accord Kraus v. Saul*, 988 F.3d 1019, 1024 (8th Cir. 2021); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). "Legal error may be an error of procedure, the use of erroneous legal standards, or an incorrect application of the law." *Lucus*, 960 F.3d at 1068 (quotation omitted).

"Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains sufficient evidence to support the agency's factual determinations." *Biestek*, 139 S. Ct. at 1154 (quotation omitted). "[T]he threshold for such evidentiary sufficiency is not high." *Id.* "It means—and means

40

only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quotation omitted); *see, e.g.*, *Chismarich v. Berryhill*, 888 F.3d 978, 979 (8th Cir. 2018) (defining "substantial evidence as less than a preponderance but enough that a reasonable mind would find it adequate to support the conclusion" (quotation omitted)).

This standard requires the Court to "consider both evidence that detracts from the [ALJ's] decision and evidence that supports it." *Boettcher v. Astrue*, 652 F.3d 860, 863 (8th Cir. 2011); *see Grindley v. Kijakazi*, 9 F.4th 622, 627 (8th Cir. 2021). The ALJ's decision "will not [be] reverse[d] simply because some evidence supports a conclusion other than that reached by the ALJ." *Boettcher*, 652 F.3d at 863; *accord Grindley*, 9 F.4th at 627; *Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012). "The court must affirm the [ALJ's] decision if it is supported by substantial evidence on the record as a whole." *Chaney v. Colvin*, 812 F.3d 672, 676 (8th Cir. 2016) (quotation omitted). Thus, "[i]f, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." *Perks*, 687 F.3d at 1091 (quotation omitted); *accord Chaney*, 812 F.3d at 676; *see also Kraus*, 988 F.3d at 1024 ("This Court will disturb the ALJ's decision only if it falls outside the available zone of choice. An ALJ's decision is not outside the zone of choice simply because this Court might have reached a different conclusion had we been the initial finder of fact." (quotations and citations omitted)).

Disability benefits are available to individuals who are determined to be under a disability. 42 U.S.C. § 423(a)(1); 20 C.F.R. § 404.315. An individual is considered to be disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see* 20 C.F.R. § 404.1505(a). This standard is met when a severe physical or mental impairment, or impairments, renders the individual unable to do her previous work or "any other kind of substantial gainful work which exists in the national economy" when taking into account her age, education, and work experience. 42 U.S.C. § 423(d)(2)(A); *see* 20 C.F.R. § 404.1505(a).

Disability is determined according to a five-step, sequential evaluation process. 20 C.F.R. § 404.1520(a)(4).

> To determine disability, the ALJ follows the familiar five-step process, considering whether: (1) the claimant was employed; (2) she was severely impaired; (3) her impairment was, or was comparable to, a listed impairment; (4) she could perform past relevant work; and if not, (5) whether she could perform any other kind of work.

*Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010). In general, the burden of proving the existence of disability lies with the claimant. 20 C.F.R. § 404.1512(a).

Plaintiff raises a host of challenges to the ALJ's decision at steps two, four, and five of the sequential process. The Court has endeavored to address them in order of that framework.

### B. Step Two: Severe Impairments

At step two, the ALJ considers the severity of a claimant's medically determinable impairments. 20 C.F.R. § 404.1520(a)(4)(ii). If a claimant does not have an impairment or combination of impairments that significantly limits her ability to do basic work activities, such impairment or impairments are not severe and the claimant is not disabled. 20 C.F.R. § 404.1520(c); *see Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007) ("Step two of the evaluation states that a claimant is not disabled if his impairments are not 'severe.'"). "An impairment is not severe if it amounts to only a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby*, 500 F.3d at 707. Basic work activities include but are not limited to things like walking, standing, sitting, lifting, reaching, seeing, hearing, speaking, following instructions, using judgment, responding appropriately to coworkers and supervisors, and dealing with changes in the work setting. 20 C.F.R. § 404.1522(b). "If the impairment would have no more than a minimal effect on the claimant's ability to work, then it does not satisfy the requirement of step two." *Kirby*, 500 F.3d at 707.

Plaintiff argues the ALJ erred by finding that her sleep apnea, foot pain, and arthritis in her right thumb were non-severe impairments and by "never address[ing] fatigue and anxiety." Pl.'s Mem. in Supp. at 31. It is Plaintiff's burden to establish that her sleep apnea, foot pain, arthritis in her right thumb, fatigue, and anxiety by themselves or in combination with other impairments constitute a severe impairment. *Kirby*, 500 F.3d at 707. While this "is not an onerous requirement . . . , . . . it is also not a toothless standard." *Id.* at 708. As borne out by Plaintiff's arguments, however, the heart of the

matter relates less to the ALJ's determination at step two and more to the ALJ's determination of her residual functional capacity at step four. Indeed, Plaintiff argues that "fatigue due to any source, and hand and foot pain impacts [her] ability to work and should be considered severe and included in the [residual functional capacity]." Pl.'s Mem. in Supp. at 32; see Pl.'s Reply at 2 ("The [residual functional capacity], however, does not adequately address the impairments the ALJ found non-severe and failed to even address impairments such as her fatigue and anxiety."), ECF No. 22. Accordingly, the Court views this argument as subsumed within Plaintiff's challenges to the determination of her residual functional capacity and overall assertion that the ALJ did not account for all of the physical and mental limitations stemming from her impairments.

That being said, it is worth noting that, while the ALJ found that Plaintiff's sleep apnea was not a severe impairment, the ALJ went on to discuss Plaintiff's allegations of "fatigue related to her physical impairments" in connection with Plaintiff's residual functional capacity at step four. Tr. 21. As such, it is not accurate to state that the ALJ "never addresses fatigue." Pl.'s Mem. in Supp. at 31; see also Pl.'s Reply at 2 ("failed to even address impairments such as her fatigue"). Likewise, although the ALJ did not expressly address Plaintiff's foot and hand pain at step two, the ALJ acknowledged Plaintiff's alleged difficulties with her hands and pain throughout her body—including her feet—at step four and extensively discussed medical records related to Plaintiff's right-foot pain and subsequent surgery, neuropathy, and fibromyalgia. Tr. 22-25. Significantly, the ALJ *did find* that Plaintiff's fibromyalgia, right-foot arthritis status post-fusion, and neuropathy *were* severe impairments. Tr. 16. Lastly, it *cannot* be said

44

that the ALJ "never addresses . . . [Plaintiff's] anxiety." Pl.'s Mem. in Supp. at 31; *see* Pl.'s Reply at 2 ("failed to even address impairments such as her . . . anxiety"). Again, while the ALJ may not have mentioned Plaintiff's anxiety at step two, the ALJ's discussion of Plaintiff's residual functional capacity is replete with references to Plaintiff's allegations of anxiety and panic attacks, Tr. 21, and addresses Plaintiff's mental-health treatment in considerable detail,[9] including times when Plaintiff's anxiety was triggered, Tr. 25-28.

To this end, "[n]umerous district courts in the District of Minnesota, and other districts in the Eighth Circuit, have held that an ALJ's failure to consider an impairment at step two is harmless error if the ALJ considered the effects of the impairment at step two or at a later step of the evaluation process." *Kendrick B. v. Kijakazi*, No. 21-cv-0068 (JFD), 2022 WL 2670052, at *4 (D. Minn. July 11, 2022) (citing cases); *see also*, *e.g.*, *Jerome S. v. Saul*, No. 19-cv-931 (ECW), 2020 WL 5798550, at *9-11 (D. Minn. Sept. 29, 2020); *Rosalind J. G. v. Berryhill*, No. 18-cv-82 (TNL), 2019 WL 1386734, at *18-20 (D. Minn. Mar. 27, 2019); *Misty G. v. Berryhill*, No. 18-cv-00587 (KMM), 2019 WL 1318355, at *2-5 (D. Minn. Mar. 22, 2019); *cf. Byes v. Astrue*, 687 F.3d 913, 917 (8th Cir. 2012) ("To show an error was not harmless, Byes must provide some indication that the ALJ would have decided differently if the error had not occurred."). Ultimately, the question is not whether Plaintiff experiences fatigue, pain, and anxiety, "but whether she

---

[9] The Court does, however, agree with Plaintiff that the ALJ's statement that Plaintiff "had not been seen for mental health or behavioral health therapy since August 2018" prior to June 2019 was an incorrect statement of fact. Tr. 26. At a minimum, the record reflects that Plaintiff met with integrative health approximately once per month between January and April 2019 in connection with her depression and saw Dr. Lichtsinn twice during this period for psychiatric care. *See supra* Section III.B.1. Thus, the Commissioner's statement that "Plaintiff also had a gap in her mental health treatment as she did not have a psychiatric visit after August 2018 until June 2019" is also incorrect. Def.'s Mem. in Supp. at 14.

has established that her fatigue[, pain, and anxiety are] disabling." *Schmitt v. Kijakazi*, 27 F.4th 1353, 1360 (8th Cir. 2022).

### C. Step Four: Residual Functional Capacity

A claimant's "residual functional capacity is the most [she] can do despite [her] limitations." 20 C.F.R. § 404.1545(a)(1); *see McCoy v. Astrue*, 648 F.3d 605, 614 (8th Cir. 2011) ("A claimant's [residual functional capacity] represents the most he can do despite the combined effects of all of his credible limitations and must be based on all credible evidence."); *see also, e.g.*, *Schmitt*, 27 F.4th at 1360. It includes "functional limitations and restrictions that result from an individual's medical determinable impairment or combination of impairments, including the impact of any related symptoms." *Titles II & XVI: Assessing Residual Functional Capacity in Initial Claims*, SSR 96-8p, 1996 WL 374184, at *1 (Soc. Sec. Admin. July 2, 1996) [hereinafter SSR 96-8p]. "Because a claimant's [residual functional capacity] is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." *Perks*, 687 F.3d at 1092 (quotation omitted); *accord Schmitt*, 27 F.4th at 1360.

At the same time, the residual-functional-capacity determination "is a decision reserved to the agency such that it is neither delegated to medical professionals nor determined exclusively based on the contents of medical records." *Norper v. Saul*, 964 F.3d 738, 744 (8th Cir. 2020); *see Perks*, 687 F.3d at 1092; *see also* 20 C.F.R. § 404.1546(c). "An ALJ determines a claimant's [residual functional capacity] based on all the relevant evidence, including the medical records, observations of treating

physicians and others, and an individual's own description of [his or her] limitations." *Combs v. Berryhill*, 878 F.3d 642, 646 (8th Cir. 2017) (quotation omitted); *accord Schmitt*, 27 F.4th at 1360; *Norper*, 964 F.3d at 744-45. As such, there is no requirement that a residual-functional-capacity determination "be supported by a specific medical opinion."[10] *Schmitt*, 27 F.4th at 1360 (quotation omitted). Nor is an ALJ "limited to considering medical evidence exclusively." *Id.* (quotation omitted). Accordingly, "[e]ven though the [residual-functional-capacity] assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner." *Perks*, 687 F.3d at 1092 (quotation omitted); *accord Schmitt*, 27 F.4th at 1360; *see* 20 C.F.R. § 404.1546(c). Plaintiff bears the burden to establish her residual functional capacity. *Mabry v. Colvin*, 815 F.3d 386, 390 (8th Cir. 2016).

Plaintiff challenges the ALJ's treatment of certain medical opinions and VA disability ratings as well as the assessment of the intensity, persistence and limiting effects of her symptoms in determining her residual functional capacity. The Court considers each in turn, beginning with the VA ratings.

### 1. VA Disability Ratings

Acknowledging that VA disability ratings "do not establish disability" under the regulations, Plaintiff asserts that "[t]he ALJ dismissed [her] VA ratings and examinations," amounting to a "blanket rejection of the VA's 100% disability rating without reference to the records or to the ratings." Pl.'s Mem. in Supp. at 37.

---

[10] Thus, to the extent Plaintiff argues that "there was no medical opinion supporting the ALJ's [residual functional capacity]," Pl.'s Mem. in Supp. at 33, the Commissioner is correct that "there is no requirement that a [residual-functional-capacity] finding be a match to a specific medical opinion," Def.'s Mem. in Supp. at 11. *See, e.g.*, *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016).

The record reflects that Plaintiff has had a series of VA disability ratings between 2004 and 2016, ultimately culminating in a 100% rating effective as of December 15, 2016.  Tr. 1229-31, 1236-40; *see generally* Tr. 1166-1242.  As noted above, Plaintiff's 100% rating was based on her fibromyalgia, neuropathy in her hands and feet, and depression.   Tr. 1230; *see* Tr. 1234-41.   The 100% rating decision was made approximately two years before Plaintiff's alleged onset date and was based on records from 2006 through April 2017.  Tr. 1236-37.

Under the regulations, VA disability-ratings decisions are "not binding" on the Social Security Administration.  20 C.F.R. § 404.1504; *see, e.g.*, *Pelkey v. Barnhart*, 433 F.3d 575, 579 (8th Cir. 2006); *see also, e.g.*, *Smith v. Colvin*, 756 F.3d 621, 625 (8th Cir. 2014).  The regulations further provide that an ALJ "will not provide any analysis in [the] determination or decision about a decision made by any other governmental agency or a nongovernmental entity about whether [the claimant is] disabled, blind, employable, or entitled to any benefits."[11]  20 C.F.R. § 404.1504.  That being said, "all of the supporting evidence" underlying such decisions are considered consistent with the manner in which objective medical evidence, medical opinions, other medical evidence, and evidence from non-medical sources is considered under 20 C.F.R. § 404.1513(a)(1) through (4).  *Id.*

Here, the ALJ noted that Plaintiff "submitted her service-connected disability paperwork" and that these records "show[ed] increasing levels of service-connected disability ratings."  Tr. 32.  The ALJ stated that "these determinations are inherently not valuable," and explained that the ratings decisions "are not persuasive as they do not

---

[11] This is for claims filed after March 27, 2017.  Plaintiff's claim was filed in December 2019.  *See, e.g.*, Tr. 13.

provide clear functional limitations and abilities, nor are they well supported by objective findings and explanation of specific functional limitations." Tr. 32.

While Plaintiff asserts that the VA ratings are "valuable in the establishment of symptoms and limitations," the ALJ correctly pointed out that the 100% rating decision relied on by Plaintiff "does not provide clear functional limitations," nor is there any "explanation of specific functional limitations." Tr. 32. It is appropriate for the ALJ to take a 'functional approach' when determining whether impairments amount to a disability." *Stormo v. Barnhart*, 377 F.3d 801, 807 (8th Cir. 2004) (quoting *Bowen v. Yuckert*, 482 U.S. 137, 146 (1987)). In addition, with the utmost respect to Plaintiff and her service to her country, it is also not readily apparent how evidence considered by the VA years before Plaintiff's alleged onset date bears on her ability to function during the narrow window of time at issue here. Again, there is no dispute that Plaintiff suffers from fibromyalgia, neuropathy, and depression. The ALJ's treatment of Plaintiff's VA 100% ratings decision was consistent with 20 C.F.R. § 404.1504 and the ALJ did not err by finding these records not persuasive under the circumstances of this case. *See Hensley*, 829 F.3d at 935.

### 2. Intensity, Persistence & Limiting Effects of Plaintiff's Symptoms

Plaintiff next asserts that the ALJ improperly considered her personal activities and the ineffectiveness of medication when assessing the intensity, persistence, and limiting effects of her symptoms.

When determining a claimant's residual functional capacity, an ALJ takes into account the claimant's symptoms, such as pain, and evaluates the intensity, persistence,

and limiting effects of those symptoms. *Titles II and XVI: Evaluation of Symptoms in Disability Claims*, SSR 16-3p, 2016 WL 1119029, at *2 (Soc. Sec. Admin. Mar. 16, 2016) [hereinafter SSR 16-3p]; *see, e.g.*, *Bryant v. Colvin*, 861 F.3d 779, 782 (8th Cir. 2017) ("Part of the [residual-functional-capacity] determination includes an assessment of the claimant's credibility regarding subjective complaints.").

> In considering the intensity, persistence, and limiting effects of an individual's symptoms, [the ALJ] examine[s] the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record.

SSR 16-3p, 2016 WL 1119029, at *4; *see* 20 C.F.R. § 404.1529(c)(2)-(3). Such evaluation includes consideration of "(i) the claimant's daily activities; (ii) the duration, frequency, and intensity of the claimant's pain; (iii) precipitating and aggravating factors; (iv) the dosage, effectiveness, and side effects of medication; and (v) the claimant's functional restrictions." *Vance v. Berryhill*, 860 F.3d 1114, 1120 (8th Cir. 2017); *see* 20 C.F.R. § 404.1529(c)(3); SSR 16-3p, 2016 WL 1119029, at *7. Although the "absence of objective medical evidence to support [a claimant's] complaints" of pain is one "factor to be considered," "the ALJ may not discount a claimant's subjective complaints solely because they are unsupported by objective medical evidence." *Halverson*, 600 F.3d at 931-32; *see* 20 C.F.R. § 404.1529(c)(2); *see also, e.g.*, *Grindley*, 9 F.4th at 630. It is also well settled that an ALJ need not "methodically" or "explicitly discuss each factor." *Schwandt v. Berryhill*, 926 F.3d 1004, 1012 (8th Cir. 2019); *Renstrom v. Astrue*, 680 F.3d

1057, 1067 (8th Cir. 2012); *see, e.g.*, *Grindley*, 9 F.4th at 630; *Bryant*, 861 F.3d at 782; *Halverson*, 600 F.3d at 932.

"Credibility determinations are the province of the ALJ, and as long as good reasons and substantial evidence support the ALJ's evaluation of credibility, [courts] will defer to [the ALJ's] decision." *Julin v. Colvin*, 826 F.3d 1082, 1086 (8th Cir. 2016) (quotation omitted); *see Grindley*, 9 F.4th at 630 ("We normally defer to an ALJ's credibility determination."); *Hensley*, 829 F.3d at 934 ("We will defer to an ALJ's credibility finding as long as the ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so." (quotation omitted)).

### a.  Daily Activities

A claimant's daily activities is one of the factors an ALJ may consider when evaluating the intensity, persistence, and limiting effects of a claimant's symptoms.  20 C.F.R. § 404.1529(c)(3)(i); SSR 16-3p, 2016 WL 1119029, at *7; *see also, e.g.*, *Swarthout v. Kijakazi*, 35 F.4th 608, 612 (8th Cir. 2022) ("While daily activities alone do not disprove disability, they are a factor to consider in evaluating subjective complaints of pain."); *Curran-Kicksey v. Barnhart*, 315 F.3d 964, 969 (8th Cir. 2003) ("Although participation in these activities does not dispositively show that Ms. Curran-Kicksey's complaints of pain were exaggerated, they certainly were appropriate matters for the ALJ to consider under *Polaski* [*v. Heckler*, 739 F.2d 1320 (8th Cir. 1984)].").

"[A]cts such as cooking, vacuuming, washing dishes, doing laundry, shopping, driving, and walking, are inconsistent with subjective complaints of disabling pain." *Halverson*, 600 F.3d at 932 (quotation omitted); *see also, e.g.*, *Swarthout*, 35 F.4th at 612

("The ALJ reasonably concluded that other daily activities—caring for personal hygiene, managing medications, preparing simple meals, stretching and performing gentle exercises, watching television, reading the newspaper, going for short walks outside, riding a bike, driving, handling money, doing some laundry, and doing some household chores in short increments—provided evidence that Swarthout is not as limited as she has alleged." (quotation omitted)); *Wright v. Colvin*, 789 F.3d 847, 854 (8th Cir. 2015) ("Wright himself admits to engaging in daily activities that this court has previously found inconsistent with disabling pain, such as driving, shopping, bathing, and cooking."); *Ponder v. Colvin*, 770 F.3d 1190, 1195 (8th Cir. 2014) ("Ponder's activity level undermines her assertion of total disability. Indeed, Ponder admitted that she, among other things, performs light housework, washes dishes, cooks for her family, does laundry, can handle money and pays bills, shops for groceries and clothing, watches television, drives a vehicle, leaves her house alone, regularly attends church, and visits her family."); *Wagner v. Astrue*, 499 F.3d 842, 852 (8th Cir. 2007) ("Wagner engaged in extensive daily activities, such as fixing meals, doing housework, shopping for groceries, and visiting friends."). "[I]t is well-settled law that 'a claimant need not prove she is bedridden or completely helpless to be found disabled.'" *Reed v. Barnhart*, 399 F.3d 917, 923 (8th Cir. 2005) (quoting *Thomas v. Sullivan*, 876 F.2d 666, 669 (8th Cir. 1989)). Yet, a claimant's daily activities remain a factor to be considered when evaluating allegations of disabling symptoms. *See, e.g.*, *Swarthout*, 35 F.4th at 612; *Curran-Kicksey*, 315 F.3d at 969.

The ALJ noted that Plaintiff lived by herself in a house; cared for her dog[12]; sometimes neglected bathing and washing her hair for up to five days as well as haircuts, but "treating providers indicate[d] she manage[d] adequate hygiene and . . . d[id] not express concern regarding [her] ability to care for herself," Tr. 19, and she otherwise had no problems with personal care; did household chores such as mowing and laundry by pacing herself, but often neglected cleaning; drove; and shopped in stores and online. Tr. 19; *see* Tr. 28. During the relevant period, the ALJ noted that Plaintiff "reported significant physical activity" that was "inconsistent with her allegations of complete inability to work," including "walking her dog and riding [her] bike frequently"; planning to go camping and mushroom-hunting for four weekends in a row; traveling to North Dakota to visit family; and having "an active holiday with her family in December 2019." Tr. 25. The ALJ focused on similar things with respect to Plaintiff's allegations of disabling mental-health symptoms, *see* Tr. 28, additionally noting that Plaintiff traveled to Florida and served as the primary support for a family member whose spouse was in hospice during the relevant period. Tr. 28.

The ALJ also looked to Plaintiff's "ongoing activities" after her date last insured. Tr. 28. The ALJ noted that Plaintiff spent a significant amount of time driving and training with her service dog. Tr. 28-29. The ALJ noted that Plaintiff continued to travel, going to California in 2020 to help a family member during a child's illness and to northern Minnesota with her family in 2021. Tr. 28. The ALJ also noted that Plaintiff

---

[12] Plaintiff had a dog as a pet during the relevant period and was later approved for a service dog after her date last insured. *See, e.g.*, Tr. 58, 665, 1151; *see generally* Tr. 1142-65.

"stayed in a camper cabin in May 2021 instead of full-on camping." Tr. 29. Additionally, the ALJ observed that Plaintiff took care of her niece and nephew one day per week in the summer of 2020 and continued to take care of them overnight once every few weeks. Tr. 29.

Plaintiff asserts that the ALJ failed "to consider the quality, frequency, and independence of [her] activities." Pl.'s Mem. in Supp. at 36. Plaintiff asserts that her camping activities were "minimal" and were encouraged by treatment providers; the ALJ did not address "the episodic nature" of her family visits and travel; and the ALJ "implie[d] if one has the ability to care for a disability assistance dog, one is not disabled." Pl.'s Mem. in Supp. at 35-36.

In the end, Plaintiff is essentially asking this Court to reweigh the evidence before the ALJ and reach an alternative conclusion, namely, that her activities were not so extensive as to be inconsistent with her allegations of disabling fatigue, pain, depression, and anxiety. In *Swarthout*, a case also involving fibromyalgia as well as chronic fatigue syndrome, the Eighth Circuit held that it was reasonable for an ALJ to

> [c]onclude[] that other daily activities—caring for personal hygiene, managing medications, preparing simple meals, stretching and performing gentle exercises, watching television, reading the newspaper, going for short walks outside, riding a bike, driving, handling money, doing some laundry, and doing some household chores in short increments—provided evidence that [the claimant wa]s not as limited, either physically or mentally, as she has alleged.

35 F.4th at 612. The record reflects that Plaintiff engaged in activities at least as extensive as the claimant in *Swarthout* during the relevant period and arguably more so,

including at least one (but possibly three additional) camping trips, a trip to North Dakota, and a trip to Florida within those eight months while also (commendably) serving as a primary support to a family member whose spouse was in hospice care. That certain of these activities could be said to be episodic when viewed categorically and in isolation does not diminish their overall quality and frequency when viewed as a whole within this relatively short period. As such, although Plaintiff "may disagree with how the ALJ weighed her subjective complaints" against her daily activities, the ALJ properly took into account the nature and degree of those activities as one factor in concluding her fatigue, pain, depression, and anxiety were not as limiting as alleged, and "it is not this Court's role to reweigh that evidence." *Schmitt*, 27 F.4th at 1361.

### b. Effectiveness of Medication

The effectiveness of medication and any other treatment other than medication a claimant uses to alleviate pain or other symptoms are relevant to the intensity, persistence, and limiting effects of a claimant's symptoms. 20 C.F.R. § 404.1529(c)(3)(iv), (v); SSR 16-3p, 2016 WL 1119029, at *7. "If an impairment can be controlled by treatment or medication, it cannot be considered disabling." *Hensley*, 829 F.3d at 933-34 (quotation omitted).

The ALJ characterized Plaintiff's mental-health treatment as "routine and conservative, involving only outpatient medication management, at times, and mental health therapy." Tr. 25-26. The ALJ referenced treatment notes indicating that Plaintiff "reported having tried numerous psychotropic medications for mental[-]health symptoms, with minimal benefit or with side effects." Tr. 26. The ALJ pointed out that Plaintiff

started a new medication and reported improvement in her symptoms, including decreased tearfulness and more mood stability. Tr. 26-27.

Plaintiff asserts that "[t]he ALJ notes symptom improvements with medication but fails to address the short-term nature of relief followed by repeated deterioration of her mental health." Pl.'s Mem. in Supp. at 37. Plaintiff asserts that the ALJ "notes one record showing decreased tearfulness without addressing the diminution of effectiveness" and "[l]ess tearfulness does not equate to not being tearful." Pl.'s Mem. in Supp. at 37.

The ALJ's discussion of Plaintiff's mental-health records reflects consideration not only of symptom improvement with medication, but also recognition of times where Plaintiff was more symptomatic notwithstanding her medication. The ALJ observed that "[p]sychiatric visit notes from June 2019 reflect [Plaintiff] reported struggling with a lot of ups and downs, and that her anxiety had been higher than usual." Tr. 26. Plaintiff was "crying a lot, avoiding people, and not answering her sister's phone calls." Tr. 26. Plaintiff was also "struggling to find energy to do things she loves including mushroom hunting." Tr. 26. While Plaintiff had a "tearful affect," she was noted to be "alert, with intact cognition and memory, normal speech," "normal thought content[,] and good insight and judgment." Tr. 26; *see also* Tr. 26 (noting report of "having increased depression symptoms over the past couple of months" in June 2019).

The ALJ discussed how Plaintiff started a new medication in July 2019, and, in August 2019, Plaintiff reported that she "was 'pretty good' and although she had had a couple of 'down days,' she reported overall things were improving," including being more active. Tr. 26; *see* Tr. 26 (noting broke plans with a friend "as she was not feeling

it"). And, while Plaintiff's mood fluctuated and she had a "tearful affect at times," the results of her mental status examinations were otherwise generally normal. Tr. 26.

The ALJ contrasted Plaintiff's presentation in August with records from September 2019, noting reports of "having a pain and depression flare-up after starting a new medication." Tr. 26. While Plaintiff's "mood was dysphoric on exam, with congruent affect," "otherwise her mental status examination was within normal limits." Tr. 26. The ALJ pointed out that, in October 2019, while Plaintiff reported that "her mood had been lower, . . . she was overall less tearful on medication" and continued to have normal mental-status-examination findings. Tr. 27.

The ALJ recognized that the period between December 2019 and February 2020 was difficult for Plaintiff. *See* Tr. 27-28. At the same time, during this period, Plaintiff also "reported a new medication was helping keep her mood more stable" and "improved mental health." Tr. 27.

The Court appreciates that "[m]ental illness is episodic by nature, symptoms can wax and wane, and an individual can have good days and bad days, such that a snapshot of any single moment may indicate little about the individual's overall condition." *Freeman v. Colvin*, No. 4:15-CV-00968-NKL, 2016 WL 4620706, at *5 (W.D. Mo. Sept. 6, 2016). Nevertheless, there is substantial evidence in the record as a whole to support the conclusion that Plaintiff's mental-health symptoms improved with medication during the relevant period, and it was proper for the ALJ to take that improvement into account when assessing the intensity, persistence, and limiting effects of Plaintiff's mental-health symptoms.

In sum, it cannot be said that the ALJ's determination that the intensity, persistence, and limiting effects of Plaintiff's mental-health symptoms were not as limiting as alleged "falls outside the available zone of choice." *Kraus*, 988 F.3d at 1024 (quotation omitted).

### 3. Opinion Evidence

Plaintiff also challenges the ALJ's assessment of the persuasiveness of certain opinion evidence, namely, Dr. Lichtsinn's opinion and the November 2020 functional assessment.

The evaluation of opinion evidence is governed by the criteria set forth in 20 C.F.R. § 404.1520c. *See Austin v. Kijakazi*, 52 F.4th 723, 728 & n.2 (8th Cir. 2022) (noting "recently revised regulations" "apply to all claims filed on or after March 27, 2017"); *cf.* 20 C.F.R. § 404.1527 (evaluating opinion evidence for claims filed before March 27, 2017). Under the regulation, medical opinions are not entitled to special deference. *Bowers v. Kijakazi*, 40 F.4th 872, 875 (8th Cir. 2022); *see* 20 C.F.R. § 404.1520c(a) ("We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources.").

> Instead, ALJs evaluate the persuasiveness of medical opinions by considering (1) whether they are supported by objective medical evidence, (2) whether they are consistent with other medical sources, (3) the relationship that the source has with the claimant, (4) the source's specialization, and (5) any other relevant factors.

*Bowers*, 40 F.4th at 875; *accord Austin*, 52 F.4th at 728; *see generally* 20 C.F.R. § 404.1520c(c) (listing factors).

58

"The first two factors—supportability and consistency—are the most important." *Bowers*, 40 F.4th at 875; *accord Austin*, 52 F.4th at 723; *see* 20 C.F.R. § 404.1520c(a), (b)(2). With respect to supportability, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . . , the more persuasive the medical opinions . . . will be." 20 C.F.R. § 404.1520c(c)(1). As for consistency, "[t]he more consistent a medical opinion(s) . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) . . . will be." 20 C.F.R. § 404.1520c(c)(2) (same). The regulation provides that the ALJ "will explain how [he or she] considered the supportability and consistency factors for a medical source's opinions in [the] . . . decision." 20 C.F.R. § 404.1520c(b)(2); *see, e.g.*, *Bonnett v. Kijakazi*, 859 F. App'x 19, 20 (8th Cir. 2021) (per curiam). ALJs "may, *but are not required to*, explain how [they] considered" the other factors. 20 C.F.R. § 404.1520c(b)(2) (emphasis added); *see Nolen v. Kijakazi*, 61 F.4th 575, 577 (8th Cir. 2023) ("Having considered the supportability and consistency of Dr. Diamond's opinion, the ALJ did not need to discuss other factors.").

### a. Dr. Lichtsinn

After summarizing Dr. Lichtsinn's May 2020 opinion, the ALJ found it was not persuasive, reasoning:

> Overall, Dr. Lichtsinn's statement is not persuasive with regard to the relevant time period considered through the date last insured, noting it was completed after the date last insured. Further, Dr. Lichtsinn's mental status examination findings with [Plaintiff] during the relevant time period were

> generally benign, including normal mentation and
> concentration findings as discussed in detail above.
> Therefore, his statement is not consistent with his own
> treatment notes. Additionally, his statement is not consistent
> with [Plaintiff's] ongoing activities during the relevant time
> period, discussed in detail above.

Tr. 31. Additionally, the ALJ observed that "Dr. Lichtsinn indicate[d] he considered

[Plaintiff's] chronic pain in completing the form, which is not within his area of expertise

as a psychiatrist." Tr. 31.

Plaintiff asserts that, in considering the persuasiveness of Dr. Lichtsinn's opinion,

the ALJ used "only boilerplate analysis, overlook[ed] supportive treatment records, and

appl[ied the ALJ's] own medical opinions over the opinion of the VA psychiatrist who

treated [her] for over six years." Pl.'s Mem. in Supp. at 28; *see* Pl.'s Reply at 8 ("The

ALJ rejected Dr. Lichtsinn's opinion using only general language which could be applied

to any medical opinion in any case."). In particular, Plaintiff asserts that the ALJ did "not

address his opinion regarding absenteeism despite a record showing isolation and refusal

to leave home for days on end, the cancellation of appointments and social events as she

was isolating" or "his opinion on her ability to act in an emotionally stable manner in

light of the plethora of treatment records regarding crying." Pl.'s Mem. in Supp. at 29.

It is not true, as Plaintiff contends, that the ALJ found Dr. Lichtsinn's opinion to

be "inconsistent with his records but fails to provide even a single example." Pl.'s Reply

at 8. The ALJ expressly found that Dr. Lichtsinn's opinion was "not consistent with his

own treatment notes" based on his own "mental status examination findings with

[Plaintiff] during the relevant time period," which "were generally benign, including

normal mentation and concentration findings." Tr. 31; *see also* Tr. 18 ("mental status examination findings are within normal limits throughout the relevant time period in terms of cognition and mentation, with no abnormal findings regarding memory"), 19 ("mental status examination findings are generally benign during the relevant time period"). While Plaintiff asserts that "[t]he records of Dr. Lichtsinn and his VA treatment team show [her] tearfulness, *decreased concentration* and depression and anxiety coming in waves," Pl.'s Mem. in Supp. at 24 (emphasis added), the ALJ correctly pointed out that Plaintiff's treatment providers noted no concerns with Plaintiff's attention and concentration during the relevant period. It is permissible for an ALJ to find a medical opinion less persuasive when it "is inconsistent with the physician's clinical treatment notes." *Davidson v. Astrue*, 578 F.3d 838, 843 (8th Cir. 2009); *see, e.g.*, *Nolen*, 61 F.4th at 577; *see also Galloway v. Kijakazi*, 46 F.4th 688, 690-91 (8th Cir. 2022); *cf. Hacker v. Barnhart*, 459 F.3d 934, 937 (8th Cir. 2006) ("A treating physician's own inconsistency may also undermine his opinion and diminish or eliminate the weight given his opinions.").

Nor did the ALJ err by finding Dr. Lichtsinn's opinion unpersuasive because it contained greater limitation than reflected in Plaintiff's daily activities and thus was inconsistent with the functioning Plaintiff exhibited in her daily living. As stated above, *see supra* Section VII.C.2.a, the ALJ properly took into account the nature and degree of those activities as one factor in concluding Plaintiff's fatigue, pain, depression, and anxiety were not as limiting as she alleged. If a doctor evaluates a patient as having greater limitations "than the patient actually exhibits in her daily living, an ALJ need not

ignore the inconsistency." *Anderson v. Astrue*, 696 F.3d 790, 794 (8th Cir. 2012); *see, e.g.*, *Fentress v. Berryhill*, 854 F.3d 1016, 1020-21 (8th Cir. 2017).

The Court does, however, agree with Plaintiff regarding two aspects of Dr. Lichtsinn's opinion, namely, the impact of her tearfulness on her ability to interact with others in the workplace and disabling-level of absenteeism.    First, with respect to Plaintiff's tearfulness, Dr. Lichtsinn opined that Plaintiff "is brought to tears very easily, unpredictably, and not necessarily related to something sad," which "affect[s] her ability to relate effectively in social situations."   Tr. 851; *see* Tr. 850.   Plaintiff's treatment providers often noted she was tearful.   The ALJ noted Plaintiff's testimony that "she is tearful even during periods where she is not acutely depressed" and, while "there are days that she does not cry, . . . most days she does cry."   Tr. 21.   Plaintiff's counsel, who was present at the hearing, has stated, as an officer of the court, that Plaintiff "cried throughout her testimony."   Pl.'s Mem. in Supp. at 17.   Upon questioning from Plaintiff's counsel, the vocational expert testified that crying is not generally permitted in the workplace.    Considering the ALJ's findings regarding Plaintiff's improvement with medication, it may be that the ALJ viewed Plaintiff's tearfulness to no longer be an issue and therefore Dr. Lichtsinn's opinion regarding the impact of Plaintiff's tearfulness was not persuasive.   It could be that the limitations on contact with others in the residual functional capacity were intended to account for Plaintiff's tearfulness.   But is not clear from the ALJ's decision how this issue was handled.   In light of the vocational expert's testimony and the evidence in the record, the ALJ must clearly articulate the treatment of Dr. Lichtsinn's opinion regarding the impact of Plaintiff's tearfulness on her ability to

interact with others in the workplace, and, if not persuasive, explain the basis therefor, or explain how the residual functional capacity accounted for Plaintiff's tearfulness in a manner that allows the Court to determine whether the ALJ's reasoning (and the residual-functional-capacity determination) is supported by substantial evidence in the record as a whole.

Second, the assessment of a claimant's residual functional capacity requires consideration of "the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule)." SSR 96-8p, 1996 WL 374184, at *7. "To qualify for work at any level, the claimant must have the ability to perform the requisite tasks of employment on a daily basis." *Noel K. A. v. Saul*, No. 19-cv-1366 (DSD/BRT), 2020 WL 5996453, at *4 (D. Minn. July 20, 2020), *report and recommendation adopted*, 2020 WL 5983554 (D. Minn. Oct. 8, 2020); *see also, e.g.*, *Kim J. H. v. Saul*, No. 18-cv-2736 (MJD/TNL), 2020 WL 872308, at *9 (D. Minn. Jan. 28, 2020), *report and recommendation adopted*, 2020 WL 869963 (D. Minn. Feb. 21, 2020); *Barbara M. v. Saul*, No. 18-cv-1749 (TNL), 2019 WL 4740093, at *14 (D. Minn. Sept. 26, 2019). When excessive absenteeism is caused by a claimant's impairment(s), a claimant "is entitled to have it considered by the vocational expert." *Baker v. Apfel*, 159 F.3d 1140, 1146 (8th Cir. 1998). Dr. Lichtsinn opined that Plaintiff would be absent three or more days per month and "presenting to work daily and on time has been a consistent barrier." Tr. 850, 851, 852. The vocational expert testified that only one absence per month would be tolerated. There may be good reasons for not finding Dr. Lichtsinn's opinion

regarding Plaintiff's degree of absenteeism not to be persuasive. But, the ALJ must clearly articulate the treatment of Dr. Lichtsinn's opinion regarding Plaintiff's absenteeism and again, if not persuasive, explain the basis therefor, in a manner that allows the Court to determine whether the ALJ's reasoning (and the residual-functional-capacity determination) is supported by substantial evidence in the record as a whole. *See Noel K. A.*, 2020 WL 5996453, at *5; *Barbara M.*, 2019 WL 4740093, at *14.

Nor can the Court accept the Commissioner's arguments that Dr. Lichtsinn's opinion was less persuasive because it was "[a]n opinion prepared for [Plaintiff's] benefits application rather than in the course of treatment"; presented in a check-list format; or lacked "the necessary support" as these were not reasons proffered by the ALJ when explaining the persuasiveness of Dr. Lichtsinn's opinion. Regardless of whether these reasons might otherwise constitute valid bases upon which to find an opinion not persuasive, the Court cannot accept such *post hac* rationalization. *See Oglala Sioux Tribe of Indians v. Andrus*, 603 F.2d 707, 715 n.7 (8th Cir. 1979) ("It is well established that an agency's action must be upheld, if at all, on the basis that was articulated by the agency itself, and that it cannot be sustained on the basis of post-hoc rationalizations of appellate counsel."). Likewise, it is not the role of this Court to speculate on the reasons that might have supported the ALJ's decision or supply a reasoned basis for that decision that the ALJ never gave. *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2127 (2016); *accord Nebraska v. U.S. Envtl. Prot. Agency*, 812 F.3d 662, 666 (8th Cir. 2016); *see Bonnett*, 859 F. App'x at 20 ("While the Commissioner argues that Dr. Thompson's opinion was not consistent with specific other evidence in the record, we will not affirm

on this basis, as the ALJ made no such findings."); *see also Nat'l R.R. Passenger Corp. v. Boston & Maine Corp.*, 503 U.S. 407, 420 (1992) ("We recognize the well-established rule that an agency's action may not be upheld on grounds other than those relied on by the agency." (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 88 (1943))).

On remand, the ALJ shall reconsider Dr. Lichtsinn's opinion regarding Plaintiff's tearfulness and degree of absenteeism. The ALJ shall articulate the reasons for the opinion's persuasiveness (or lack thereof), fully addressing the supportability and consistency factors as well as any other relevant factors, "so a reviewing court can make a meaningful assessment of a challenge to [the] ALJ's evaluation of the persuasiveness of . . . [Dr. Lichtsinn's] medical opinion[]." *Hirner v. Saul*, No. 2:21-CV-38 SRW, 2022 WL 3153720, at *9 (E.D. Mo. Aug. 8, 2022).

### b. November 2020 Functional Assessment

Plaintiff asserts that the ALJ did not adequately explain why the opinions of the state agency medical consultants regarding her physical functioning were more persuasive than the November 2020 functional assessment.

### i. State Agency Medical Consultants

After summarizing the findings of the state agency medical consultants, the ALJ concluded that their opinions were "generally persuasive in determining [Plaintiff's] residual functional capacity, though the [ALJ] further limited [Plaintiff] in terms of kneeling, crawling, . . . climbing, exposure to vibration, noise level, and pace of work, as well as overhead reaching, to fully accommodate [Plaintiff's] array of complaints, to the extent limitations are supported by the objective findings of record." Tr. 30.

65

Plaintiff is correct that the ALJ "provides no analysis" as to *why* these opinions are persuasive. Pl.'s Mem. in Supp. at 30. As noted above, the regulations require the ALJ to "explain how [he or she] considered the supportability and consistency factors for a medical source's opinions in [the] . . . decision." 20 C.F.R. § 404.1520c(b)(2). Failure to comply with the relevant regulations is legal error. *Lucus*, 960 F.3d at 1070; *see Bonnett*, 859 F. App'x at 20. And, courts in this District, the Eighth Circuit, and elsewhere have concluded that the failure to address or adequately explain either the supportability or consistency factors (or both) when evaluating the persuasiveness of a medical opinion warrants remand. *E.g.*, *Violet G. v. Kijakazi*, No. 21-cv-2105 (TNL), 2023 WL 2696594, at *6-7 (D. Minn. Mar. 29, 2023) (supportability); *Susan H. v. Kijakazi*, No. 21-cv-2688 (ECT/ECW), 2023 WL 2142786, at *3 (D. Minn. Feb. 21, 2023) (both); *Michael B. v. Kijakazi*, No. 21-cv-1043 (NEB/LIB), 2022 WL 4463901, at *2 (D. Minn. Sept. 26, 2022) (supportability); *Joel M. B. v. Kijakazi*, No. 21-cv-1660 (PAM/ECW), 2022 WL 1785224, at *3 (D. Minn. June 1, 2022) (both); *see, e.g.*, *Maxwell v. Kijakazi*, No. 3:20-cv-00408 PSH, 2021 WL 5998018, at *2 (E.D. Ark. Dec. 20, 2021) (consistency); *Guess v. Kijakazi*, No. 4:20-CV-887-JTR, 2021 WL 5983193, at *4 (E.D. Ark. Dec. 17, 2021) (both); *Bonneau v. Saul*, No. 3:20-cv-0095 PSH, 2021 WL 920981, at *5-6 (E.D. Ark. Mar. 10, 2021) (supportability); *Crews v. Kijakazi*, No. 4:20-CV-01836-NCC, 2022 WL 4130793, at *3-4 (E.D. Mo. Sept. 12, 2022) (both); *Hirner v. Saul*, No. 2:21-CV-38 SRW, 2022 WL 3153720, at *8 (E.D. Mo. Aug. 8, 2022) (supportability); *Martini v. Kijakazi*, No. 4:20 CV 1711 CDP, 2022 WL 705528, at *5 (E.D. Mo. Mar. 9, 2022) (supportability); *Pipkins v. Kijakazi*, No. 1:20 CV 161 CDP, 2022 WL 218898, at *4-5

(E.D. Mo. Jan. 25, 2022) (both); *Starman v. Kijakazi*, No. 2:20-cv-00035-SRC, 2021 WL 4459729, at *4-5 (E.D. Mo. Sept. 29, 2021) (supportability); *see also, e.g.*, *Price v. Kijakazi*, No. 6:21-cv-1345-EJK, 2022 WL 4377480, at *2-3 (M.D. Fla. Sept. 22, 2022) (both factors); *Garrett v. Kijakazi*, No. 1:21-CV-00046-GCM, 2022 WL 1651454, at *3 (W.D. N.C. May 24, 2022) (supportability); *Rivera v. Comm'r of the Soc. Sec. Admin.*, No. 19-CV-4630 (LJL) (BCM), 2020 WL 8167136, at *15-17 (S.D. N.Y. Dec. 30, 2020) (supportability), *report and recommendation adopted*, 2021 WL 134945 (S.D. N.Y. Jan. 14, 2021).

Here, the ALJ addressed neither the supportability nor the consistency factor and the Court is left to speculate on what basis the ALJ found the opinions of the state agency medical consultants to be "generally persuasive." Failure to do so "is a legal error that warrants remand."[13] *Michael B.*, 2022 WL 4463901, at *2; *see Bonnett*, 859 F. App'x at 20; *Lucus*, 960 F.3d at 1070; *see also, e.g.*, *Starman*, 2021 WL 4459729, at *4-5; *Bonneau*, 2021 WL 92081, at *5-6.

On remand, the ALJ shall reconsider the opinions of the state agency medical consultants and articulate the reasons for their persuasiveness (or lack thereof), fully addressing the supportability and consistency factors as well as any other relevant factors, "so a reviewing court can make a meaningful assessment of a challenge to [the] ALJ's evaluation of the persuasiveness of . . . [their] medical opinions." *Hirner*, 2022 WL 3153720, at *9.

---

[13] This true notwithstanding "the adequacy of the ALJ's general summary of the evidence of record." *Pipkins*, 2022 WL 218898, at *4; *see Martini*, 2022 WL 705528, at *5. "[T]he Court may not decide the facts anew, reweigh the evidence, or substitute its own judgement for that of the [ALJ]." *Price*, 2022 WL 4377480, at *3.

ii. **Persuasiveness of the November 2020 Functional Assessment**

Turning now to the November 2020 Functional Assessment itself, here too, Plaintiff is essentially asking this Court to reweigh the evidence. Again, it bears repeating that the question is not whether Plaintiff's neuropathy and fibromyalgia cause pain and numbness, but whether her symptoms impact her functioning to a disabling level. *See Schmitt*, 27 F.4th at 1360; *see also Hutton v. Apfel*, 175 F.3d 651, 654 (8th Cir.1999) ("As is true in many disability cases, there is no doubt that the claimant is experiencing pain; the real issue is how severe that pain is." (quotation omitted)); *Nicole W. v. Kijakazi*, No. 20-cv-2697 (SRN/BRT), 2022 WL 3047088, at *5 (D. Minn. July 14, 2022) ("As is true in many disability cases, there is no doubt that the claimant is experiencing pain, but complaints of pain alone are not determinative of whether there should be a finding of disability."), *report and recommendation adopted*, 2022 WL 3045130 (D. Minn. Aug. 2, 2022).

The ALJ's conclusion that the November 2020 functional assessment was not persuasive for the relevant period because it "was completed nearly a year after [Plaintiff's] date last insured" and reflected limitations that were "inconsistent with [Plaintiff's] functioning and course of treatment during the relevant period" is not outside the available zone of choice. Tr. 31. While Plaintiff focuses on records documenting neuropathy and complaints of pain and numbness, the ALJ correctly noted that Plaintiff did not have an "inability to ambulate effectively," Tr. 17, and "demonstrated improvement in the quality of [her] gait, lower extremity strength and balance" following

68

physical therapy, Tr. 23. At the time she was discharged from physical therapy, Plaintiff ambulated "without significant gait deviation." Tr. 656. At her one-year appointment following foot surgery, Plaintiff was doing very well, increasing her walking, and reported that, although she had occasional issues with her right foot including "slight paresthesias," "this was not problematic for her" and she "rarely" thought about it. Tr. 631; *accord* Tr. 388. The ALJ accurately observed that Plaintiff had "little follow-up" for her neuropathy during the relevant period. Tr. 23. The same is true with respect to Plaintiff's use of her hands. The ALJ correctly pointed out that Plaintiff was able to "perform fine and gross movements effectively," Tr. 17, and did "not have additional follow-up during the relevant period for complaints regarding the upper extremities," Tr. 24. Further, during the relevant period, the ALJ noted that Plaintiff generally managed her own personal care, prepared her own meals, did some household chores, drove, shopped in stores and online, walked her dog, rode her bike, traveled to two states, and camped.

Significantly, the ALJ explained that even if Plaintiff were restricted to sedentary work,[14] where the weight lifted and carried is less and the amount of walking and standing is reduced, "there would still be several sedentary occupations available within the further restricted residual functional capacity, available in significant numbers in the

---

[14]

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a).

national economy (document preparer, addresser, tube operator)," based on the testimony of the vocational expert. Tr. 33. Thus, from a physical-limitations standpoint, "there would still be jobs available in significant numbers even if [Plaintiff] were further limited." Tr. 33.

Accordingly, on remand, the ALJ may, but is not required to, reevaluate the persuasiveness of the November 2020 functional assessment.

### D. Step Five: Vocational Expert Testimony

Because the Court has recommended that this matter be remanded for the ALJ to reconsider certain opinion evidence regarding Plaintiff's tearfulness, absenteeism, and physical functioning, the Court further recommends that the ALJ's decision be vacated at step five as the reconsideration of such opinions may alter the limitations included in any hypothetical posed to a vocational expert. The ALJ may also wish to receive additional testimony from a vocational expert regarding tearfulness and absenteeism in the workplace. *See Noel K. A.*, 2020 WL 5996453, at *5 n.9. Accordingly, in light of the Court's further recommendation that the ALJ's decision at step five be vacated, the Court does not reach Plaintiff's remaining assignments of error regarding the hypothetical questions posed to the vocational expert and whether there was proper foundation for the vocational expert's testimony.

The Court does, however, offer the following observations. First, an ALJ need only include "those impairments and limitations . . . found to be supported by the evidence as a whole in [the] hypothetical to the vocational expert." *Perkins v. Astrue*, 648 F.3d 892, 902 (8th Cir. 2011); *see Kraus*, 988 F.3d at 1026; *Cox*, 471 F.3d at 907.

70

"A hypothetical is not insufficient because it does not include all the health limitations *alleged* by the claimant." *Kraus*, 988 F.3d at 1027. Second, as the Commissioner points out, Plaintiff did not get a service dog until approximately one year after her date last insured. Third, the Social Security Administration itself contemplates that occupational information may come from a vocational expert's "experience in job placement or career counseling," of which here there were 35 years of such experience. *Titles II & XVI: Use of Vocational Expert & Vocational Specialist Evidence, & Other Reliable Occupational Information in Disability Decisions*, SSR 00-4p, 2000 WL 1898704, at *2 (Soc. Sec. Admin. Dec. 4, 2000); *cf. Welsh v. Colvin*, 765 F.3d 926, 930 (8th Cir. 2014).

[Continued on next page.]

## VIII. RECOMMENDATION

Based upon the record, memoranda, and the proceedings herein, and for the reasons stated above, **IT IS HEREBY RECOMMENDED** that:

1. Plaintiff's Motion for Summary Judgment, ECF No. 17, be **GRANTED IN PART** and **DENIED IN PART**.

2. The Commissioner's Motion for Summary Judgment, ECF No. 20, be **GRANTED IN PART** and **DENIED IN PART**.

3. The ALJ's decision be **AFFIRMED** as to steps one through four, except as to consideration of Dr. Lichtsinn's opinion regarding Plaintiff's tearfulness and degree of absenteeism and the state-agency medical consultants' opinions on Plaintiff's physical functioning, and **VACATED** as to step five.

4. This matter be **REMANDED** to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.

Dated: July___31___, 2023                    _____*s/ Tony N. Leung*_____
                                             Tony N. Leung
                                             United States Magistrate Judge
                                             District of Minnesota


                                             *Sara Z. v. Kijakazi*
                                             Case No. 22-cv-226 (DSD/TNL)


## <u>NOTICE</u>

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in LR 72.2(c).